Filed 7/24/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S092240 |
| v. | ) | |
| | ) | |
| KEVIN DEWAYN BOYCE, | ) | |
| | ) | Orange County |
| Defendant and Appellant. | ) | Super. Ct. No. 97NF2316 |
| _____ | ) | |

Kevin Dewayn Boyce (defendant) and Andre Willis burglarized two businesses, robbing several people inside. During the first crime, off-duty peace officer Shayne York was killed. A jury convicted defendant of first degree murder with the special circumstances of killing a peace officer in retaliation for the performance of his duties and of murder during the commission of robbery and burglary.[1] Because the jury found the peace officer special circumstance true, it necessarily concluded defendant fired the single fatal shot. Defendant was also convicted of two counts of second degree robbery and one count of second degree burglary in connection with that incident.[2] On all charges defendant was found to

---

[1] Penal Code sections 187, 190.2, subdivision (a)(7) and (17) former (1) and (7), now (A) and (G). Further undesignated statutory references are to the Penal Code.

[2] Sections 211, 212.5, subdivision (c), 459, 460, subdivision (b).

have personally used a firearm.[3]  The second incident resulted in convictions of three counts of second degree robbery, three counts of attempted second degree robbery, and one count of second degree burglary, all with personal firearm use.[4]

Defendant was sentenced to death, and to a determinate term of 34 years four months in state prison.[5]  This appeal is automatic.  We affirm in all particulars save one aspect of his determinate term.  (*Post*, at pp. 66-73, 76.)

## I.  FACTS

### A.  Guilt Phase

#### 1.  Prosecution

Shayne York and his fiancée, Jennifer Parish,[6] were both Los Angeles County deputy sheriffs.  On August 14, 1997, they were planning a trip to Las Vegas for Jennifer's birthday.  Around 7:30 p.m., they went to the DeCut salon in Buena Park where Jennifer's sister, Amy, had agreed to style their hair.  The three were alone in the salon.  All neighboring businesses were closed.

Suddenly, Willis entered the shop wielding a semiautomatic handgun. Defendant followed closely behind, also carrying a handgun.  When Willis yelled, "Get the fuck on the ground, whiteys," the three victims complied.  The men

---

[3]    Former section 12022.5, subdivision (a), repealed and reenacted without substantive change.

[4]    Sections 211, 212.5, subdivision (c), 664/211, 459, 460, subdivision (b), and former section 12022.5, subdivision (a).

[5]    The determinate sentence was stayed pending execution of the death sentence.  Willis was tried separately and convicted of first degree murder, burglary, and multiple counts of robbery and attempted robbery.  He was sentenced under the "Three Strikes" law to 75 years to life on the murder count and multiple consecutive terms of 25 years to life for the other crimes.

[6]    Jennifer and another trial witness, Amy Parish, share the same last name. We refer to them by their first names to avoid confusion.

2

demanded to know the location of the register. Amy directed them to the cash drawer, which contained about $11.

After checking the drawer, defendant became agitated and demanded to know "where is the fucking money?" Amy offered approximately $40 to Willis. York volunteered another $100. Defendant demanded York's wallet, kicking him when he did not respond quickly enough. Meanwhile, Willis yanked Jennifer off the ground, searched her pockets, and took her watch and engagement ring.

While searching York, defendant discovered his sheriff's badge and said, "Well, well, well. Look what we have here, a mother fucking pig." Defendant demanded to know where York worked. York replied, "Wayside" and "East Facility."[7] Defendant, who previously had been incarcerated there, asked York if he "liked to treat nigger Crips like shit in jail?" York responded, "No, sir." Defendant retorted, "No, I know you like to treat us nigger Crips like shit in jail." York again responded, "No, sir." Defendant demanded and received the personal identification number (PIN) for York's automated teller machine (ATM) card.

One of the robbers said, "Fuck the whitey," and a shot was fired. York collapsed, bleeding profusely. Someone then declared that he had always wanted to kill a cop and that he hoped this one died. Neither Jennifer nor Amy saw the gun being fired, but both women believed that defendant had shot York based on the relative positions of the robbers.

As York lay dying, Willis rummaged through Jennifer's purse looking for her ATM card. Discovering her badge, he announced, "We've got another mother fucking pig in here." He asked which of the two women was the "other fucking white pig," and Jennifer raised her hand. Willis said, "Don't worry, bitch. We're

_____

[7]     These names refer to Peter Pitchess Honor Farm.

not going to shoot you. You're a fucking woman." At his demand, Jennifer turned over her ATM card and said the PIN was written on the sleeve. The men left.

York had been shot in the head. Jennifer held him while Amy called 911. Both women spoke to the operator. York ultimately died from a single gunshot that penetrated his brain. The position of the wound was consistent with the shooter standing over York and firing as he lay facedown.

The same night, around 10:00 p.m., Edward Tharp, Sean Gillette, Mark Cook, and Christopher Pierce were having a late dinner at Lamppost Pizza in Yorba Linda. Employees Rodney Tamparong and Ernest Zuniga were preparing to close. While emptying the trash, Tamparong noticed Willis and defendant in a Ford Mustang. One said, "Hey, come over here." Fearing they intended to rob him, Tamparong hurried back to the restaurant. Willis gave chase. Tamparong tried to close the door. Willis forced his way in and yelled, "Get on the floor, mother fuckers."

Willis opened the back door, and defendant entered carrying a semiautomatic firearm. Willis emptied the cash register, then forced Zuniga to open the safe. In total, Willis stole $483. Meanwhile, defendant robbed the restaurant patrons at gunpoint, demanding their wallets and declaring, "Look at all the white boys that we got on the floor," and "gotcha boys." Defendant kicked Tharp, Pierce, and Cook, and held a gun to Gillette's head. Tharp produced his wallet containing $80. Pierce likewise surrendered his wallet. Cook concealed his money in a pocket and maintained he had none. Gillette also said he had no wallet, but he offered a duffle bag. Defendant took nothing from Cook or Gillette.

When defendant asked if the men were cops, Cook said they were teachers. Defendant asked what he taught, and Cook replied "special ed." Defendant responded, "I was in special ed class." At that point, the tension lessened.

4

Tamparong overheard defendant's question about police officers and hid his park ranger badge under a table. When Willis demanded Tamparong's wallet, he denied having one. Willis searched him, took nothing, and the robbers left.

At 10:40 p.m., in response to a suspect vehicle description, a Fullerton police officer stopped the Mustang. Willis drove with defendant as the sole passenger. At the detention scene, Tharp identified them as the Lamppost robbers. Tamparong identified Willis. Amy recognized Willis's clothing and build, but could not identify his face. At a subsequent live lineup, Tharp identified Willis and defendant as the robbers, and Amy identified Willis.

A search of Willis uncovered $756 and Jennifer's watch. Defendant carried $253 and three gloves. Hidden in the Mustang's center console, officers found credit cards belonging to Jennifer and York. A loaded semiautomatic and a loaded revolver were hidden behind the speakers in the backseat. Under the trunk lining officers recovered Willis's driver's license, registration for the Mustang, York's ATM card, and a DeCut Hair Salon business card with York's PIN written on it. The ATM card had been used to make a $200 withdrawal from York's account at 9:41 p.m. on August 14, 1997, at a bank located in the same mall as the Lamppost. Willis's fingerprint was found on York's Visa card. Despite an extensive search in several locations, Jennifer's engagement ring was never found.

The revolver hidden in the Mustang had an expended round in the chamber in line with the barrel. Ballistics testing confirmed it was the murder weapon. Defendant's right index fingerprint was found just above the grip. Several witnesses identified the recovered semiautomatic as similar to the one used in both robberies.

On August 15, 1997, Willis and defendant were placed together in an interview room where their conversation was covertly recorded. Willis told defendant that they were being investigated for attempted murder and robbery. He

5

said that the police had pictures of "take out," slang for a handgun. Defendant responded, "They found em? . . . Dang." Willis told defendant, "We ain't gonna say nothing, we're gonna ride this shit out man," and "when the mother fuckers come and talk, I'll put it on a third person. . . . I ain't going down for no mother fucking watch coward."[8] Defendant asked, "Well who's the third mother fucking person?" and "Are you going to make up a story now?" Defendant said he as well "sure ain't doing [attempted murder] for no mother fuckin' watch coward." Willis replied, "I'm telling you this, I'm gonna ride it out, ok. But, in the end result in trial time (inaudible) both of us don't need to go to hell for this shit." Defendant replied, "Keep it down. Popo is sittin' right there. Man, two strikes, that's 25 anyway. We're totally fucked." A few minutes later, however, he observed, "Oh man, they can't prove it . . . . They can't prove a mother fuckin' thing. It's my word against they mother fuckin' word." Defendant then asked, "how can they put this shit on somebody, though? Who the nigga supposed to attempted murder anyway? . . . Female, male, what?" Willis responded, "Some mother fuckin' male, police." Defendant replied, "Male police? What mother fucker that bold? I didn't kill no police. Damn."

On August 17, 1997, district attorney investigator Douglas Kennedy and Police Detective Ruben Gomez interviewed defendant. Defendant initially maintained his innocence. He claimed that the money he had when arrested came from gambling and selling marijuana. Kennedy told defendant that he had plenty of evidence linking defendant to the shooting of Deputy York and urged him to tell his side of the story. Defendant retorted that crooked officers had planted evidence against him.

---

[8] "Watch coward" is slang for a correctional officer.

6

Defendant then volunteered that if he could smoke one cigarette he would tell them exactly what had happened. Kennedy agreed to provide a cigarette when the interview concluded. Defendant stated that he had a "split personalit[y]." He does not like his "white man's" name of Kevin Boyce. He is Osiris, king of the underworld and lord of the dead. He said Osiris "musta had too much, um, the devil juice or as [*sic*] alcohol, his drugs." He was "buzzin' tipstin" and could not remember exactly what had happened.

He recounted the following details of the salon incident. Someone had told him that the shop would be an easy target with $7,000 on hand. Defendant asked Willis for a ride. Willis did not know of his plan and did not go inside. Defendant ordered a man and woman to the floor. He was unaware York was a deputy sheriff. Discovering there was no safe, he took money from the woman's purse and the register. He took no jewelry. When he bumped into a chair, the gun discharged accidentally. He remembered "a pow ya" of the gun going off, and "I was like, damn." He did not think he had shot anyone. He claimed to be carrying a nine-millimeter semiautomatic weapon. He retrieved the expended shell casing from the floor.

Willis drove defendant away. Defendant saw the Lamppost and told Willis to take him there. Again, defendant maintained that he acted alone. The restaurant was closed, but defendant said he wanted to order a pizza as a ruse to get inside. There were four customers, two women and two men. Defendant brandished the semiautomatic then ordered everyone to get on the floor and empty their pockets. Defendant took about $77 and left. No shots were fired. Defendant explained he had "[l]earned from the last mistake. So I kept my finger off the trigger."

7

*2. Defense*

Defense counsel conceded defendant's participation in the Lamppost incident and his guilt on the resultant charges. He argued that Willis and an unidentified third person committed the DeCut Salon crimes, but admitted defendant's guilt of the burglary, robberies, and first degree felony murder because he had acted as a lookout. He contested only the special circumstance allegations.

Defendant introduced evidence that Jennifer's engagement ring was not recovered, suggesting a third party could have taken it. A handwriting expert compared the numbers written on the salon business card with known exemplars of defendant's handwriting and opined that they did not match.

Two experts testified about the reliability of defendant's confession. Richard Leo, a professor at University of California at Irvine, studies police interrogations. He noted techniques used in defendant's interview that could induce a confession. The police repeatedly stated that there was strong evidence against defendant and urged him to tell his side of the story. Leo urged that even trivial inducements can cause a suspect to confess. Here, defendant offered to tell the investigators what had happened if they would give him a cigarette. After the investigators agreed, defendant confessed. Leo opined that inconsistencies between the suspect's confession and the known facts of the crime can suggest that the confession is unreliable.

Licensed Clinical Psychologist Kara Cross conducted neuropsychological tests to measure defendant's intelligence, brain processing, motor skills, sensory perception, memory, and cognition. On the Wechsler Adult Intelligence Scale (WAIS), defendant's overall verbal intelligence quotient (IQ) score was 80, falling in the bottom 5 percent. His performance IQ of 68 is in the mentally retarded

8

range. His full scale IQ of 69 reflects mental retardation.**9** He scored a high of 86 on verbal comprehension.

Dr. Cross also administered the Luria Nebraska test to detect organic brain damage. Defendant had severe impairment in several areas, including rhythm and tactical function, reading, writing, and arithmetic. He was not impaired in memory, expressive and receptive speech, or motor skills. Based on these results, Dr. Cross prepared a chart showing the areas of defendant's brain damage. Although the functioning areas compensated to some degree, defendant still demonstrated significant impairment.

Dr. Cross reviewed defendant's school records for kindergarten through 10th grade. At age seven, defendant took the Slosson IQ test and received a score of 114, which is above average. Dr. Cross opined, however, that the test was unreliable. On the Peabody Picture Vocabulary Test (PPVT) defendant received an IQ score of 83, below average. When he was nearly 13 years old, defendant was again tested. On the Wechsler Intelligence Scale for Children-Revised (WISC-R) defendant scored a verbal IQ of 88, below average, and a performance IQ of 74, a borderline score. His Slosson IQ was 80, below average, and his PPVT IQ was 70, again borderline functioning.

In Dr. Cross's opinion, defendant is not gravely disabled.**10** He is capable of understanding the difference between right and wrong, truth and falsehood, and cause and effect. He can make decisions and communicate with others.

---

**9** Dr. Cross testified that an IQ of 80-89 is below average, 79-70 is borderline intellectual functioning, and 69 or below is mentally retarded.
**10** The Welfare and Institutions Code defines " 'gravely disabled' " in part as "[a] condition in which a person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (Welf. & Inst. Code, § 5008, subd. (h)(1)(A).) A person with intellectual

*(footnote continued on next page)*

B.  *Penalty Phase*

### 1.  *Prosecution*

Jennifer, along with York's brother and parents, testified about York's life and the suffering his death had caused them.

The prosecution presented documentary evidence that defendant had been convicted of robbery in 1989 and of possession of a firearm by a felon in 1994.

Damani Gray recounted that in 1987, when he was 12 years old, defendant approached him on the street and asked if he belonged to a gang.  Gray said he did not, and defendant asked if he wanted to be from the Rolling '60's Crips gang.  After Gray said no, defendant punched him in the face repeatedly, knocking him unconscious.  Defendant later told an officer that "he is going to fuck up the punk who had him arrested when he gets out of jail."

### 2.  *Defense*

In addition to Dr. Cross's testimony in the guilt phase, defendant introduced evidence that he had brain damage, learning disabilities, and mental illness, and was burdened by a disjointed home life.  By the time he was 17 years old, he had changed residences 12 times, attending 23 schools.

Around age two, defendant had a severe fever and seizures spanning several days.  He did not speak again until he was five.  He repeated kindergarten and first grade.  Defendant's first grade teacher in North Carolina described him as the most learning disabled student she had encountered in 30 years of teaching.

---

*(footnote continued from previous page)*

disabilities is not gravely disabled "by reason of that disability alone."  (Welf. & Inst. Code, § 5008, subd. (h)(3).)

Because he did not test below a 70 IQ and his mother minimized his learning disability, his special needs went largely unmet.

Defendant was hospitalized with another high fever when he was between 9 and 12 years old. One relative recalled that he was in a coma.

When defendant was 13, his family moved to California, living primarily in gang-controlled neighborhoods. His mother drank heavily. He attended some special education classes but was later removed from the program at his request. One of his cousins was an active gang member, and defendant eventually joined the Rolling '60's Crips gang. One aunt recalled he drank and used phencyclidine (PCP).

Psychiatrist Samuel Benson opined that defendant's abnormal electroencephalogram (EEG) and history of learning disabilities are consistent with organic brain damage. School records indicated that from age four on, defendant consistently performed three years behind grade level. However, he showed great confidence and ability in sports.

Dr. Benson diagnosed defendant based on the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) multiaxial system. On Axis I, defendant showed an unspecified psychosis and abuse of alcohol, marijuana, and PCP. On Axis II, defendant demonstrated schizotypal disorder, meaning that he responds to stress by demonstrating odd beliefs, magical thinking, unusual perceptions, suspiciousness, paranoid ideation, inappropriate or restricted affect, and eccentric behavior. He lacks close friends and is socially anxious. Defendant has learning disabilities secondary to organic brain disease existing since childhood. Defendant had no diagnosis on Axis III. On Axis IV, defendant experienced severe psychosocial stressors during incarceration. On Axis V, a global assessment of functioning within the past year, Dr. Benson gave defendant a rating of 40 out of 100, meaning that defendant should be hospitalized. In Dr. Benson's

opinion, defendant does not have an antisocial personality disorder. He acknowledged that defendant was capable of making choices such as deciding whether to shoot someone.

Defendant told Dr. Benson that he began hearing voices as early as age three or four. When he was 10, defendant formed a belief that he was a commander in God's army against evil, which helped him cope with his fear of the dark. Later, after a release from juvenile hall, his mother and sister recalled that defendant hallucinated he was the Egyptian god Osiris. Dr. Benson opined that defendant's voices and delusions helped him cope with stress. Defendant did not claim that voices had told him to commit the charged crimes.

Defendant's family members described him as a shy but loving person. He helped care for his grandmother and great-grandmother. He was a good father to his seven-year-old daughter.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. Admissibility of 911 tape recordings

The People sought to introduce recordings of 911 calls made immediately after the salon shooting. The first call lasts approximately 48 seconds. Jennifer tells the operator, "we need an ambulance" and "[m]y husband's been shot in the head." Her voice is rapid and panicked. She pleads with the operator, "Hurry. Help. And please hurry," and then asks "[a]re you coming?" At times she can be heard crying. The second call lasts approximately one minute and 48 seconds. Amy says "Oh, my God." She tells the operator that York has been shot in the back of the head "and there's stuff coming out of his nose." She describes the suspects as "two black men. They each have a gun" and confirms that "[t]hey

12

took the guns with them." She then exclaims, "Please help him," "[w]here is the ambulance?" and "Oh, God" in a desperate and frustrated voice.

Defendant objected to admission of the 911 tapes in the guilt and penalty phases as irrelevant, unduly prejudicial, and a violation of his constitutional right to due process. The trial court overruled the objections, finding that the tapes were relevant to credibility and not unduly prejudicial. The tapes were played in the guilt phase but not in the penalty phase. The jury was instructed, however, that "[i]n determining which penalty is to be imposed on the defendant, you shall consider all the evidence which has been received during any part of the trial of this case."

Defendant claims that the court abused its discretion in admitting evidence that he characterizes as irrelevant and unduly inflammatory. The argument fails.

We review these evidentiary rulings for abuse of discretion. (*People v. Streeter* (2012) 54 Cal.4th 205, 237 (*Streeter*).) A court abuses its discretion if it acts "in an arbitrary, capricious, or patently absurd manner." (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)

"As a rule, the prosecution in a criminal case involving charges of murder or other violent crimes is entitled to present evidence of the circumstances attending them even if it is grim" (*People v. Osband* (1996) 13 Cal.4th 622, 675), and even if it "duplicate[s] testimony, depict[s] uncontested facts, or trigger[s] an offer to stipulate" (*People v. Stitely* (2005) 35 Cal.4th 514, 545). In *People v. Roybal* (1998) 19 Cal.4th 481, we upheld admission of spontaneous statements of the victim's husband to a 911 dispatcher and to an officer describing the crime scene and his wife's body. In the 911 call he reported that his wife was covered in blood and not breathing, and that it looked as if she had been murdered. During an interview, he described finding his dead wife lying in the hallway, and explained how he entered the house. (*Id.* at p. 515.) We observed that the tapes were

"relevant to show [the husband's] initial reaction to the discovery of his wife's body and dispel any suggestion that he was involved in the murder; they also described the scene of the crime." (*Id*. at p. 517; accord, *Streeter, supra*, 54 Cal.4th at pp. 236-238 [tape of victim screaming during an ambulance ride to the hospital properly admitted as relevant to show victim's pain and suffering at the time of actual events in a charge of torture murder].)

The trial court did not abuse its discretion in admitting the tapes to provide a contemporaneous account of the crime scene and information about the robbers. Although Amy and Jennifer testified in detail at trial, the court had broad discretion to admit corroborating evidence that was nearly contemporaneous with the crimes. (*Streeter, supra*, 54 Cal.4th at pp. 236, 238.) The tapes also assisted the jury in evaluating Amy's and Jennifer's credibility. The defense attempted to show that the intense trauma of the incident compromised their ability to accurately perceive the shooter's identity. By listening to the tapes, the jury was able to evaluate firsthand the women's demeanor in the moments following the crimes.

The court legitimately concluded that the probative value of the tapes was not substantially outweighed by undue prejudice. While the women are certainly in distress, their comments and affect are not unduly shocking, considering the nature of the crimes. " ' "[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant" ' [citations], and we rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial than probative [citation]." (*People v. Gurule* (2002) 28 Cal.4th 557, 624 (*Gurule*).)

Finally, the court did not abuse its discretion by allowing the jury to consider the 911 tapes in the penalty phase. Such evidence shows " ' "the direct impact of the defendant's acts on the victims' friends and family" ' " as a relevant

14

circumstance of the crime under section 190.3, factor (a). (*People v. Hawthorne* (2009) 46 Cal.4th 67, 101, quoting *People v. Zamudio* (2008) 43 Cal.4th 327, 364; accord, *People v. Dykes* (2009) 46 Cal.4th 731, 781 (*Dykes*).) In *Hawthorne*, the trial court admitted as impact evidence a 911 tape recording of the 16-year-old victim shortly after the crimes. The victim reported two men had shot her and her mother, gave a description of her assailants, and provided her address. When a neighbor arrived and took the telephone from the victim, the victim could be heard screaming in the background. (*Hawthorne*, *supra*, 46 Cal.4th at p. 101.) In affirming, we observed that "the 911 tape clearly showed the immediate impact and harm caused by defendant's criminal conduct toward the surviving victim and was relevant because it ' "could provide legitimate reasons to sway the jury to . . . impose the ultimate sanction." ' [Citation.]" (*Id*. at p. 102.) The evidence was similarly relevant here.

Defendant argues that the 911 tapes were so inflammatory as to provoke a purely irrational response from the jury, ultimately rendering the penalty trial fundamentally unfair. Not so. "[T]he trial court's discretion to exclude evidence regarding the circumstances of the crime as unduly prejudicial is more circumscribed at the penalty phase than at the guilt phase of a capital murder trial, because the sentencer is expected to weigh the evidence subjectively." (*People v. Salcido* (2008) 44 Cal.4th 93, 158.) Nor was the evidence cumulative to Jennifer's victim impact testimony at the penalty phase because "only the tape conveyed the more immediate impact of the crimes on her." (*People v. Hawthorne, supra*, 46 Cal.4th at p. 103.) Finally, the risk of prejudice was slight. The jury had already found defendant guilty based in part on a proper consideration of this evidence. There is little risk that the jurors would have reacted so emotionally to their recollection of the evidence during the penalty phase that they should be instructed to disregard it. (See *People v. Moon* (2005) 37 Cal.4th 1, 35 (*Moon*).) Further, at

15

defense counsel's request, the trial court instructed that "[s]ympathy for the family of the victim is not a matter you may consider in aggravation. Evidence, if any, of the impact of the victim's death on family members should be disregarded unless it illuminates some positive quality of the victim's background and character."[11] No abuse of discretion appears.

Because the evidence was properly admitted, we necessarily reject defendant's constitutional claims that admission of the tape deprived him of his rights to due process, a fair trial, and a reliable and nonarbitrary penalty determination. (*Streeter, supra,* 54 Cal.4th at p. 238; *People v. Hawthorne, supra*, 46 Cal.4th at p. 103; *Moon, supra*, 37 Cal.4th at p. 35.)

### 2. *Flight instruction* (*CALJIC No. 2.52*)

The court gave CALJIC No. 2.52 explaining that flight immediately after the commission of a crime may be considered as evidence of guilt, but is not alone sufficient to support a conviction. Defendant renews his objection below that there was insufficient evidence of flight to warrant the instruction. He also argues that several aspects of the standard instruction deprived him of his constitutional rights. These claims fail.

"In general, a flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his

---

[11] CALJIC now includes a standard instruction explaining the permissible use of victim impact evidence consistent with our case law: "Victim impact evidence has been received in this trial for the purpose of showing, if it does, the financial, emotional, psychological or physical effects of the victim's death on the family and friends of the victim[s]. You may consider this evidence as part of the circumstances of the crime in determining penalty. Your consideration must be limited to a rational inquiry, and must not be simply an emotional response to this evidence. These witnesses are not permitted to offer any opinion as to what is the appropriate penalty in this case." (CALJIC No. 8.85.1 (Spring 2010 new) (Spring 2014 ed.); see *Dykes, supra,* 46 Cal.4th at p. 781.)

movement was motivated by a consciousness of guilt.' [Citations.] ' "[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested." ' [Citations.]" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.)

Merely being at the scene and leaving it does not necessarily reflect a consciousness of guilt. (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.) A person who does only that may be unaware that a crime has occurred, or may leave for reasons other than to avoid observation or arrest. (*People v. Crandell* (1988) 46 Cal.3d 833, 869.) Such is not the case here. Defendant and his partner entered both businesses armed with guns, abused and threatened victims, stole from them and then left. They clearly knew York was in mortal jeopardy. One robber said, "I hope this one dies." Neither man attempted to render aid or call for assistance. They hid the handguns and stolen items in their car. These factors are more than sufficient to support an inference that defendant left the scene to avoid apprehension. (See, e.g., *Bonilla*, at p. 329 [defendant immediately left the scene and did not attempt to aid victim or to call for assistance]; *People v. Jurado* (2006) 38 Cal.4th 72, 126 [defendant hid the murder weapon and did not call for help from a nearby call box]; *People v. Smithey* (1999) 20 Cal.4th 936, 982 (*Smithey*) [defendant rammed his car through a closed gate and did not summon help].) Notably, the instruction told the jury that it could consider flight "if proved," that flight is "not sufficient in itself to establish . . . guilt," and that "[t]he weight to which this circumstance is entitled is a matter for you to decide." There was no error.

Defendant also mounts several challenges to the standard instruction, including that it unduly favors the prosecution, is argumentative and duplicative, is inapplicable when identity is conceded, creates an improper permissive inference,

17

and lessens the prosecution's burden of proof.[12]  As he acknowledges, we repeatedly have rejected these claims.  (See *Streeter, supra,* 54 Cal.4th 205, 254; *People v. McWhorter* (2009) 47 Cal.4th 318, 377; *People v. Loker* (2008) 44 Cal.4th 691, 706-707; *People v. Mendoza* (2000) 24 Cal.4th 130, 179-181; *Smithey, supra*, 20 Cal.4th at p. 983.)  He offers no persuasive reason to overrule these decisions.

Accordingly, defendant's arguments that the instruction deprived him of due process, equal protection, a fair jury trial, and a fair and reliable penalty determination also fail.  (*Benavides, supra,* 35 Cal.4th at p. 100.)

> 3.  *Special circumstance for intentionally killing a peace officer (§ 190.2, subd. (a)(7))*

Defendant claims that insufficient evidence supported the finding that he intentionally killed Deputy York in retaliation for the lawful performance of his duties.  He also argues that the special circumstance allegation is unconstitutionally vague.  We reject both contentions.

A jury's true finding on a special circumstance allegation must be supported by substantial evidence.  (*People v. Mayfield* (1997) 14 Cal.4th 668, 790-791.)  The whole record is reviewed "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the [special circumstance allegation true] beyond a

---

[12]    The Attorney General argues that defendant forfeited his claim that CALJIC No. 2.52 lessened the burden of proof by failing to object on that ground below.  We agree with defendant that no objection was necessary because, if he were correct, such an error would have affected his substantial rights.  (§ 1259; *People v. Benavides* (2005) 35 Cal.4th 69, 99-100 (*Benavides*).)

reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.)

Section 190.2, subdivision (a)(7) defines the applicable special circumstance, in relevant part, as: "The victim was a peace officer, as defined . . . , and was intentionally killed in retaliation for the performance of his or her official duties."[13]

Jennifer Parish testified that the second suspect, whom the jury determined was defendant, said, "Whitey is a mother fucking pig" after discovering York's sheriff's badge. He asked York where he worked and whether he enjoyed treating gang members badly. Defendant responded to York's denial: "No, I know you like to treat us nigger Crips like shit in jail." One of the robbers said, "Fuck the whitey" just before defendant shot York in the back of the head. One of the two commented that he had always wanted to kill a cop. Although Jennifer could not identify which man made the remarks, the jury reasonably could have attributed them to defendant, whom they determined to be the shooter.

Amy recounted much the same conversation. She also heard one robber say, "Good, I hope this one dies." Again, the jury reasonably could have attributed this comment to defendant.

Other facts support the finding. After York was shot, Willis found Jennifer's badge, observed, "We've got another mother fucking pig in here," and asked which of the two women was the officer. Having left York to die, the men

---

**13**    The jury instructions defined "in the performance of his duties" to include "[g]uarding or transporting any person lawfully under arrest or undergoing imprisonment in any city or county jail or in any prison or institution under the jurisdiction of the California Department of Corrections or California Youth Authority."

went to the Lamppost, where defendant asked if any of those victims were in law enforcement.

Finally, there was additional evidence that defendant was a Crips gang member, incarcerated in 1994 at the facility where York worked. This independent evidence is consistent with defendant's remarks to York, and reflect his motive for the murder.

This evidence supported a conclusion that defendant resented peace officers' treatment of himself and fellow gang members, and that he intentionally killed York in retaliation for his employment as an officer. It is immaterial that York may not have actually mistreated defendant and his fellow gang members. It is the "accused's subjective intent that is crucial" to establish the peace officer killing special circumstance. (*People v. Weidert* (1985) 39 Cal.3d 836, 854 [discussing special circumstance of killing a witness]; accord, *People v. Jenkins* (2000) 22 Cal.4th 900, 1021 (*Jenkins*) [applying same standard to special circumstance of killing a peace officer].) Defendant's own statements made his intention abundantly clear.

Defendant counters that the statute's use of the word retaliate requires proof he knew of specific actions by York providing a logical or temporal relationship between the officer's performance of his duties and defendant's motive to kill him. He cites as an example *Jenkins, supra*, 22 Cal.4th 900, where the special circumstance was upheld based on evidence that defendant killed a police detective who was investigating him for a robbery. (*Id.* at pp. 932-937, 1022.) Here, by contrast, defendant argues that the evidence shows nothing more than a "status" killing of a peace officer which, in his view, does not satisfy the statutory elements.

We reject defendant's narrow interpretation of the statute. Section 190.2, subdivision (a)(7) is clear and unambiguous. It subjects an individual to a

20

sentence of death or life imprisonment without parole for intentionally killing a peace officer "in retaliation for the performance of his or her official duties." (*Ibid*.)  Nothing in the plain language of the statute supports defendant's view that the retaliation must be in response to an officer's specific acts, which are known by and specifically linked to the defendant.

Indeed, imposing such a requirement would be contrary to the electorate's intent in enacting section 190.2, subdivision (a)(7).  The language at issue was part of the Briggs Initiative, enacted by the voters in November 1978 to supplant the Legislature's 1977 death penalty statute.  (Prop. 7, § 6, approved by voters Nov. 7, 1978; *People v. Rodriguez* (1986) 42 Cal.3d 730, 777 (*Rodriguez*).)  The analysis contained in the official voter materials states broadly that a special circumstance would apply to the "murder of any peace officer . . . with respect to the performance of such person's duties."  (Cal. Voters Pamphlet, Gen. Elec. (Nov. 7, 1978) analysis of Prop. 7 by Legis. Analyst, p. 32.)  The argument in favor of the initiative likewise affirms that the death penalty would apply to killing of certain *categories* of victims, including judges, prosecutors, firefighters, and the President of the United States.  (Cal. Voters Pamphlet, Gen. Elec., *supra*, argument in favor of Prop. 7, p. 34; see *Arias v. Superior Court* (2009) 46 Cal.4th 969, 979 [considering official election materials submitted to the voters to ascertain electorate's intent].)

Our opinion in *Rodriguez, supra,* 42 Cal.3d 730, also supports this view. That case involved a constitutional challenge to the statute's provision that a special circumstance applies when the defendant intentionally kills a peace officer who was engaged in the course of the performance of his or her duties and the defendant knew or reasonably should have known such facts.  (*Id*. at pp. 780-781.) In upholding the statute's " 'reasonably should have known' " provision (*id*. at p. 779), we explained the special circumstance "gives effect to the special outrage

21

that characteristically arises from the intentional murder of persons acting in certain official public safety capacities. Society considers such killings especially serious for several reasons. The community abhors the human cost to these especially endangered officers and their families, 'who regularly must risk their lives in order to guard the safety of other persons and property.' (*Roberts v. Louisiana* [(1977)] 431 U.S. 633, 636.) Murders of this kind threaten the community at large by hindering the completion of vital public safety tasks; they evince a particular contempt for law and government, and they strike at the heart of a system of ordered liberty." (*Id*. at p. 781.) It would subvert the statute's broader purpose to require proof of retaliation based on a defendant's knowledge of an officer's specific actions.

Defendant's reliance on *Jenkins* to support a narrower interpretation of the statute is misplaced. As noted, Jenkins was charged with murdering an off-duty police detective who had been investigating his participation in a robbery. (*Jenkins, supra,* 22 Cal.4th at pp. 932-937, 1022.) He urged that someone else had shot the detective. He also presented evidence to support an argument that the detective had fabricated a case against him and was therefore not engaged in the lawful performance of his duties. (*Id*. at pp. 938-939.) We upheld the special circumstance finding, observing that there was substantial evidence the detective was engaged in a lawful investigation and that "defendant killed [him] in retaliation for the detective's part in the Carpenter prosecution . . . ." (*Id*. at p. 1022.) Simply because those facts existed in *that* case does not mean they are required in *every* case. The legal insufficiency challenge fails.

Defendant mounts other unmeritorious constitutional attacks. First, he maintains that the special circumstance is unconstitutionally vague as applied here and fails to provide adequate notice because it is unclear whether the officer's performance of his official duties must relate to the defendant. A penal statute

22

violates due process requirements if it is so vague that a person of common intelligence must speculate as to its meaning. (*Lanzetta v. New Jersey* (1939) 306 U.S. 451, 453.) To survive such a challenge, "[the] statute must be definite enough to provide a standard of conduct for those whose activities are proscribed as well as a standard for the ascertainment of guilt by the courts called upon to apply it." (*People v. McCaughan* (1957) 49 Cal.2d 409, 414.) "A statute will be upheld if its terms may be made reasonably certain by reference to common law [citations] or to its legislative history or purpose." (*Ibid.*)

It is not difficult to understand the concept of retaliation against a peace officer for doing his duty. The word "retaliate" is commonly understood and adequately communicates the extent of the proscribed conduct. (Cf. *People v. Ledesma* (2006) 39 Cal.4th 641, 725 [rejecting a vagueness challenge to the witness-killing special circumstance].) As defendant notes, the jury inquired whether the peace officer "ha[s] to perform a duty at the time of the crime?" The court correctly answered no. The question does not reflect confusion over the concept of retaliation. It requested clarification of the distinction between the two ways the circumstance may be satisfied. The special circumstance applies to the intentional killing of an officer performing his duties or in retaliation for the performance of those duties. (§ 190.2, subd. (a)(7).) The facts here implicate only the second variation. The court correctly explained that an "engaged in" killing requires that the officer be actively performing his duties, while a "retaliation" killing does not.

Second, he argues that, because the statute is susceptible of more than one reasonable construction, it must be construed in the manner most favorable to him. But this rule of lenity does not help defendant here. It applies " 'only if the court can do no more than guess what the legislative body intended; there must be an egregious ambiguity and uncertainty to justify invoking the rule.' " (*People v.*

23

*Avery* (2002) 27 Cal.4th 49, 58; accord, *People v. Manzo* (2012) 53 Cal.4th 880, 889.)  "In other words, 'the rule of lenity is a tie-breaking principle, of relevance when " 'two reasonable interpretations of the same provision stand in relative equipoise . . . .' " ' [Citation.]" (*Manzo,* at p. 889, quoting *Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1102, fn. 30.)  There is no uncertainty here.

Finally, defendant urges that applying the special circumstance to him is an unforeseeable judicial enlargement of a criminal statute in violation of due process.  (*People v. Blakeley* (2000) 23 Cal.4th 82, 92.)  He is incorrect.  The plain language of the statute encompasses his conduct.  Defendant cites no established rule to the contrary that would constitutionally bar application of a clear statute to his crime.  (*People v. Rathert* (2000) 24 Cal.4th 200, 209-210.)

### 4. *Robbery-murder and burglary-murder special circumstances (§ 190.2, subd. (a)(17))*

Defendant challenges the robbery-murder and burglary-murder special circumstances on three grounds:  sufficiency of the evidence, improper instruction, and unconstitutionality.  The claims are unavailing.

#### a. *Sufficiency of the evidence*

 "The felony-murder special circumstance applies to a murder committed while the defendant was engaged in, or was an accomplice in the commission of, the attempted commission of, or the immediate flight after committing or attempting to commit, various enumerated felonies . . . .  A strict causal or temporal relationship between the felony and the murder is not required; what is required is proof beyond a reasonable doubt that the defendant intended to commit the felony at the time he killed the victim and that the killing and the felony were part of one continuous transaction." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 87 (*Coffman*).)

24

Defendant argues that the special circumstance findings cannot stand because there was no evidence the burglary and robbery were independent of the murder. Invoking our holding in *People v. Green* (1980) 27 Cal.3d 1 (*Green*) he reasons that the evidence showed he killed York in retaliation for being a peace officer and not to advance either felony.

He misapprehends the rule. In *Green*, the defendant took his wife to a remote location, forced her to undress, then killed her in revenge for her infidelity. He was convicted of first degree murder with a robbery-felony-murder special circumstance based on the taking of the victim's clothing. (*Green*, *supra*, 27 Cal.3d at pp. 11-16.) We set aside the special circumstance, reasoning that it was arbitrary and capricious to impose a death judgment when the defendant intends to commit a murder and only incidentally commits one of the specified felonies while doing so. (*Id*. at p. 61.) Stated another way, "where the defendant's intent is to kill, and the related offense is only incidental to the murder, the murder cannot be said to have been committed in the commission of the related offense." (*People v. Williams* (1988) 44 Cal.3d 883, 927; accord, *People v. Marshall* (1997) 15 Cal.4th 1, 41 (*Marshall*) [overturning robbery-murder special circumstance based on evidence that defendant took a letter from the victim as a token of the rape and killing].)

Here, there was compelling evidence that defendant and Willis entered the salon intending to commit a felony inside and that defendant shot York "while . . . engaged in" (§ 190.2, subd. (a)(17)) the commission of burglary and robbery. The two men, armed with guns, barged into the establishment and ordered all three victims to the floor. They took money and valuables from the victims and the store cash register. Defendant shot York after looking through his wallet; he and Willis then continued taking property from Jennifer and Amy. They left a mortally injured York bleeding on the floor as they escaped with the loot.

25

Defendant admitted to police that he went to the salon believing there was $7,000 in a safe and that it would be an "easy place to hit." There was no evidence that defendant simply entered the salon to kill York. (See *People v. Seaton* (2001) 26 Cal.4th 598, 646 [the burglary-murder special circumstance does not apply to a burglary committed for the sole purpose of killing the victim].) This jury could rationally conclude that defendant had the "independent felonious purpose" to commit burglary and robbery (*People v. Abilez* (2007) 41 Cal.4th 472, 511 (*Abilez*)), and that these felonies and the murder were part of a continuous transaction (*Coffman, supra*, 34 Cal.4th at p. 88).

Defendant cites *People v. Bonin* (1989) 47 Cal.3d 808 for the proposition that he must commit "the act resulting in death in order to advance an independent felonious purpose" (*id*. at p. 850), namely burglary or robbery. He misreads our precedent. *Green*'s requirement means only that "he must not perpetrate the underlying felony as 'merely incidental to the murder.' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 519, fn. 17, quoting *Green, supra*, 27 Cal.3d at p. 61; accord, *People v. Raley* (1992) 2 Cal.4th 870, 903.) "The only intent required to find the felony-murder-robbery special circumstance allegation true is the intent to commit the robbery before or during the killing." (*People v. Huggins* (2006) 38 Cal.4th 175, 215.) "[T]here is no requirement that the prosecution prove an additional or different element that the killing be committed to 'advance' the felony." (*Dykes, supra,* 46 Cal.4th at pp. 760-761.)[14]

---

[14] CALJIC No. 8.81.17, as given to the jury here, encompasses the *Green* rule. The jury was instructed that "[t]o find that the special circumstance, referred to in these instructions as murder in the commission of robbery or burglary, is true, it must be proved: [¶] Number one, the murder was committed while a defendant was engaged in or was an accomplice in the commission or attempted commission of the robbery or burglary; and [¶] Number two, the murder was committed in order to carry out or advance the commission of the crime of robbery or burglary

*(footnote continued on next page)*

26

The facts surrounding defendant's entry into the salon demonstrate that his primary motivation was robbery and burglary, crimes with an " 'independent purpose.' " (*People v. Carpenter* (1997) 15 Cal.4th 312, 387.)[15]  This independent purpose was not negated by the fact that defendant subsequently decided to kill York in retaliation for being a police officer.  (*People v. Clark* (2011) 52 Cal.4th 856, 947.)  "[A] concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance."  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1158 (*Barnett*); accord, *People v. Davis* (2009) 46 Cal.4th 539, 609; *Abilez, supra*, 41 Cal.4th at p. 511; *People v. Horning* (2004) 34 Cal.4th 871, 904; *People v. San Nicolas* (2004) 34 Cal.4th 614, 656.)

_____

*(footnote continued from previous page)*

or to facilitate the escape therefrom or to avoid detection.  In other words, the special circumstance referred to in these instructions is not established if any robbery or burglary was merely incidental to the commission of the murder."

CALJIC No. 8.81.17 accurately states the law.  (*Dykes, supra*, 46 Cal.4th at p. 761, fn. 5.)  "The 'carry out or advance' language found in the pattern instruction is based upon our cases and constitutes merely another way of describing the *Green* rule—that a felony murder is not established by proof of a felony that was merely incidental to a murder."  (*Ibid*.)  Nonetheless, CALCRIM No. 730, which omits any reference to "carry out or advance" is clearer.  That instruction states in part:  "in order for this special circumstance to be true, the People must prove that the defendant intended to commit [the felony] independent of the killing.  If you find that the defendant only intended to commit murder and the commission of [the felony] was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved."  (*Ibid*.)

[15]     Contrary to defendant's contention, the prosecutor did not concede the absence of evidence that the killing was "committed to advance either the burglary or the robbery."  Rather, he argued that defendant could have "two different reasons" for killing York — to facilitate the burglary and robbery, and as retribution for his being a peace officer.

27

The burglary and robbery were not merely "incidental or ancillary to the murder." (*Abilez, supra*, 41 Cal.4th at p. 511; accord, *People v. Davis, supra,* 46 Cal.4th at p. 609.) Indeed the decision to shoot York and the reason for doing so arose only after defendant entered the salon and began taking property. The evidence suffices.

### b. *Alleged misinstruction*

As noted, the court gave CALJIC No. 8.81.17, which read: "To find that the special circumstance, referred to in these instructions as murder in the commission of robbery or burglary, is true, it must be proved: [¶] Number one, the murder was committed while a defendant was engaged in or was an accomplice in the commission or attempted commission of the robbery or burglary; and [¶] Number two, the murder was committed in order to carry out or advance the commission of the crime of robbery or burglary or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if any robbery or burglary was merely incidental to the commission of the murder."

During deliberations, the jury asked: "Re: page 53, part 2 of the jury instructions. Question: If first degree murder is committed as a consequence of or results from the intent or commission of armed robbery and/or burglary, is this sufficient to establish the special circumstance cited?" With the agreement of both counsel, the court answered: "it depends upon what the jury finds to be the facts, okay? That's the answer. I propose to reread the jury instruction that you have just alluded to because, obviously, that states the law, all right?" The court then reread CALJIC No. 8.81.17 and repeated, "So, again, the answer to your question is it just depends upon what the jury finds to be the facts."

28

Defendant argues that the court had an obligation to alleviate the jury's confusion about the application of the special circumstances. He claims the court failed to do so and misled the jury by suggesting that it need not find the defendant killed to advance an independent felonious purpose. He claims the error deprived him of due process, trial by jury, proof beyond a reasonable doubt, presentation of a complete defense, and a reliable death penalty determination. He fails to persuade.

Defendant forfeited his appellate challenge by expressly agreeing to the court's response. The court interpreted the jury's question as requesting guidance on how it should resolve a factual issue, and observed that the answer "depends upon what they are finding to be the facts." It did not "want to suggest anything one way or another" about how they should make this factual assessment. Defense counsel agreed with this interpretation, and with the court's proposed response. Indeed, defense counsel observed: "the answer to that question with respect to 8.81.[1]7 . . . is right there on the instruction. [¶] . . . [¶] . . . And it really depends on what they determine the facts to be and there are, I don't know, any number of different ways they can interpret the facts and then have to interpret the law and how they apply to the facts." He further commented, "[T]he question that they are asking is begging an interpretation of what the facts really mean."

"When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal." (*Dykes, supra,* 46 Cal.4th at p. 802; accord, *People v. Marks* (2003) 31 Cal.4th 197, 237.)

In any event, it is not reasonably likely the court's response misled the jury. (*Dykes, supra*, 46 Cal.4th at p. 804.) "The court is under a general obligation to

29

'clear up any instructional confusion expressed by the jury,' but '[w]here . . . the original instructions are themselves full and complete, the court has discretion . . . to determine what additional explanations are sufficient to satisfy the jury's request for information.' " (*Dykes, supra,* 46 Cal.4th at p. 802, quoting *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1213; see also § 1138.) Here, the court reread CALJIC No. 8.81.17, which correctly stated the law. Defendant does not argue otherwise.

Defendant interprets the question to ask if the special circumstance could be based solely on a finding that defendant was "engaged in" a burglary or robbery. The court's response, he maintains, should have been "no;" its actual response, "it depends upon what the jury finds to be the facts," allowed the jury to return a special circumstance finding without finding that he had an independent felonious purpose. This interpretation is untenable.

The jury's question focused on a killing that is "committed as a consequence of or results from the *intent* or *commission* of armed robbery and/or burglary." (Italics added.) The phrasing of the question conveyed a basic understanding that the felony must be independent of the murder. By rereading CALJIC No. 8.81.17 in its entirety, the court reaffirmed that point. It emphasized that "the special circumstance referred to in these instructions is not established if any robbery or burglary was merely incidental to the commission of the murder." (*Ibid*.) This instruction effectively explains that for this felony-murder special circumstance to apply, "the murder must be committed while the defendant was engaged in robbery or [burglary] (or immediate flight after commission of [those felonies]), and not the other way around, that is to say, not if the defendant intended to commit murder 'and only incidentally committed [the robbery or burglary]' while doing so." (*People v. Stanley* (2006) 39 Cal.4th 913, 956-957

(*Stanley*).)  The court's response thereby correctly conveyed the *Green* rule.  The jury would have understood the court's response in this manner.

### c.  *Constitutional challenge*

Finally, consistent with long-standing precedent, we reject defendant's claim that the felony-murder special circumstances must be set aside because they fail to narrow the class of death-eligible defendants to a smaller subclass more deserving of death.  (*Stanley, supra,* 39 Cal.4th at p. 968; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1265-1266; *People v. Anderson* (1987) 43 Cal.3d 1104, 1146-1147.)

### B.     *Penalty Phase Issues*

#### 1.  *Denial of the right to self-representation*

Defendant alleges that the court erroneously denied his Sixth Amendment right to self-representation at the penalty phase.  (*Faretta v. California* (1975) 422 U.S. 806, 835-836 (*Faretta*).  His claim fails because he did not make an unequivocal demand to proceed pro se.

The same day the jury returned its guilt phase verdicts, defendant made a motion to substitute counsel.[16]  In camera,[17] the defendant affirmed he was asking that his attorneys be relieved and that other counsel be appointed to represent him. He explained that he was satisfied with his attorneys' performance at the guilt phase, but that he wanted them removed because they "did their job already, you know, and ain't no need to put no defense for me for the penalty phase."

When asked if he wanted substitute counsel, defendant said, "No."  When asked if he wanted to represent himself, defendant again said, "No," explaining

---

[16]     *People v. Marsden* (1970) 2 Cal.3d 118.

[17]     We ordered this proceeding unsealed at defendant's request.

31

that "I just want the prosecutor to put his little—what he want to put up." The court explained that defendant had to choose one or the other. Defendant then asked, "If I represent myself, I could just be quiet then, right?" The court confirmed that defendant could "do pretty much what you feel is appropriate to do with respect to the penalty phase of the trial." Defendant responded, "I just want Mr. Davis and Ron Klar moved off my case. I don't want no new lawyers, *I don't want to represent myself*." (Italics added.) The court sought clarification, asking, "You want new lawyers?" Defendant again responded, "No, I don't want no new lawyers. *I don't want to represent myself.* I just want the prosecutor to do the rest of his little job and I will go on my way." (Italics added.)

The court asked defense counsel, "is this a *Faretta* hearing or *Marsden*?" Counsel responded, "I don't think that's really what it is." He explained that defendant did not want to present any evidence in mitigation, but that counsel felt an ethical obligation to mount a defense.

The court observed that it was having difficulty determining whether defendant wished to represent himself but that "I think that's what you are saying because you are telling me you don't want another lawyer appointed and you want the court to relieve Mr. Klar and Mr. Davis." The court inquired, "You basically just want to sit there during the penalty phase and let the D.A. put on his evidence without anybody asking those people any questions?" Defendant responded, "You know, your Honor, if I could have it my way, I don't want to be here at all. I want to stay in the jail. You could notify me of the outcome."

The court deemed defendant to have made a *Faretta* motion as "part and parcel of a *Marsden* request." The court questioned defendant, who revealed that he had quit high school in the 10th grade, had no employment history, had never before represented himself, and had no legal knowledge. The court denied defendant pro se status, noting that the request was untimely and finding that

32

defendant was unqualified to represent himself due to his lack of education and his mental impairment, as testified to by Dr. Cross.[18]

"A trial court must grant a defendant's request for self-representation if the defendant knowingly and intelligently makes an unequivocal and timely request after having been apprised of its dangers. [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 97-98 (*Valdez*); accord, *Faretta, supra*, 422 U.S. at pp. 835-836.) The right of self-representation applies to the penalty phase of a capital trial. (*People v. Doolin* (2009) 45 Cal.4th 390, 453 (*Doolin*); *People v. Blair* (2005) 36 Cal.4th 686, 736-737 (*Blair*).) Erroneous denial of a proper request is reversible per se. (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 177-178, fn. 8.)

"*Faretta* itself and later cases have made clear that the right of self-representation is not absolute, [citations]." (*Edwards, supra*, 554 U.S. at p. 171 [listing limitations on the right].) For example, when the self-representation motion is untimely, "self-representation is no longer a matter of right but is subject to the trial court's discretion." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1365.) For purposes of assessing timeliness, the guilt and penalty phases are parts of a

---

**18**    After defendant's trial, the United States Supreme Court held that a defendant who is competent to stand trial may nonetheless be denied self-representation due to a mental condition that impairs his or her ability to carry out the basic tasks needed to present the defense without counsel's assistance. (*Indiana v. Edwards* (2008) 554 U.S. 164, 174-178 (*Edwards*).) This court has since followed *Edwards* and adopted its standard for competency to represent oneself. (*People v. Johnson* (2012) 53 Cal.4th 519, 527-530.) Because we resolve defendant's *Faretta* claim on other grounds, we need not decide whether the trial court, acting before our decision in *Johnson*, was authorized to deny self-representation to defendant on this basis. (See generally *Johnson, supra,* 53 Cal.4th at pp. 527-528, 531 [discussing retroactivity principles]; *People v. Taylor* (2009) 47 Cal.4th 850, 874-876, 879-881 [before *Edwards*, California courts generally interpreted federal law to prohibit states from imposing a higher standard of competency for self-representation than the standard of competency to stand trial].)

single trial. "[A] motion made between the guilt and penalty phases is thus untimely and subject to the trial court's discretion." (*People v. Mayfield, supra,* 14 Cal.4th at p. 810, accord, *Doolin, supra*, 45 Cal.4th at p. 454.) Additionally, special considerations inform a request for self-representation in a capital case. By statute, "a plea of guilty to a capital felony may not be taken except in the presence of counsel, and with counsel's consent. (§ 1018.) Even if otherwise competent to exercise the constitutional right to self-representation [citation], a defendant may not discharge his lawyer in order to enter such a plea over counsel's objection. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1055.)

Defendant contends that the court erred by considering his lack of education as a basis for denying the *Faretta* request (see *Doolin, supra*, 45 Cal.4th at p. 454), failing to determine whether his request was knowing and intelligent, and failing to apply the factors outlined in *People v. Windham* (1977) 19 Cal.3d 121, 128-129 to assess an untimely request.[19] We need not resolve these contentions, however, because "the record as a whole establishes defendant's request was nonetheless properly denied on other grounds . . . ." (*People v. Dent* (2003) 30 Cal.4th 213, 218 (*Dent*).) No Sixth Amendment violation occurred because defendant did not make an unequivocal demand to represent himself.

"[T]he *Faretta* right is forfeited unless the defendant ' "articulately and unmistakably" ' demands to proceed in propria persona." (*Valdez, supra,* 32 Cal.4th at p. 99.) Because the right to counsel is self-executing and persists unless the defendant affirmatively waives the right, the court must indulge every

---

[19]    Defendant also urges us to reconsider our holdings that a request for self-representation made between the guilt and penalty phases of a capital trial is untimely.

34

reasonable inference against such a waiver. (*Marshall, supra,* 15 Cal.4th at p. 20; *Brewer v. Williams* (1977) 430 U.S. 387, 404.)

Although the court here interpreted defendant's request as one for self-representation, we are not bound by that understanding. (*Valdez, supra*, 32 Cal.4th at p. 99; *Barnett, supra*, 17 Cal.4th at p. 1087; *Marshall, supra*, 15 Cal.4th at p. 25.) Indeed, we reject it. Defendant stated that he wanted counsel removed from the case. At no point did he indicate that he wished to represent himself if his request was denied. (*Valdez,* at pp. 100-101.) Quite the contrary, he explicitly stated three times that he *did not* wish to represent himself. When the court explained that he must choose either representation by counsel or self-representation, defendant expressly stated that he wanted *neither*. The trial court could not accommodate that request. As we explained in *Marshall,* defendant has mutually exclusive rights to either counsel or self-representation. (*Marshall, supra*, 15 Cal.4th at p. 20.) Because the court must draw every reasonable inference against waiver of the right to counsel, it was not error to allow defense counsel's continued representation.

Defendant argues that his stated desire to control his defense at the penalty phase by removing his attorneys and forgoing replacement counsel mandates a finding that he effectively sought self-representation. That assertion fails. A defendant may choose self-representation in order to control defense strategy. (*Blair, supra,* 36 Cal.4th at p. 738; *People v. Clark* (1990) 50 Cal.3d 583, 617.) Defendant certainly expressed a desire not to contest the penalty phase. But he also repeatedly insisted that he did not want to act as his own counsel. Indeed, when asked about his plans to conduct his own defense, defendant explained, "You know, your Honor, if I could have it my way, I don't want to be here at all. I want to stay in the jail. You could notify me of the outcome."

35

This comment reflects a desire *not to participate* in the defense that is inherently inconsistent with a proper *Faretta* demand. The right to present a defense must be exercised in court (*Ferrel v. Superior Court* (1978) 20 Cal.3d 888, 891),[20] and the right to self-representation contemplates a defendant's active participation. As the United States Supreme Court explained in *Edwards, supra,* 554 U.S. 164, the *Faretta* standard must take into account defendant's ability to "present his own defense without the help of counsel" (*Edwards*, at p. 176) and to "conduct trial proceedings" (*id*. at p. 178) including "organization of defense, making motions, arguing points of law, participating in *voir dire*, questioning witnesses, and addressing the court and jury" (*id*. at p. 176). California statutory law precludes a capital defendant from absenting himself when evidence is taken at trial. (§§ 977, subd. (b)(1), 1043, subd. (b)(2); *People v. Rundle* (2008) 43 Cal.4th 76, 134-135, disapproved on another ground in *Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.) A defendant who seeks self-representation in order to absent himself signals an intent to violate "relevant rules of procedural and substantive law." (*Faretta, supra,* 422 U.S. at pp. 834-835, fn. 46.)

Simply stated, defendant wished to proceed in a way the law does not allow. His desire to do what the law prevents cannot be transformed into a request to do what the law permits but that he does not want. Accordingly, the court properly allowed defense counsel to remain on the case and to present mitigating evidence on defendant's behalf. (*People v. Roldan* (2005) 35 Cal.4th 646, 682 ["counsel's decision to contact defendant's family over his express wishes was a tactical decision counsel was entitled to make"], disapproved on another ground in *Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.)

---

[20] Abrogated on another ground as stated in *People v. Butler* (2009) 47 Cal.4th 814, 826.

This case is distinguishable from *Dent, supra,* 30 Cal.4th 213, upon which defendant relies. There, the court relieved defense counsel over the defendant's express objection. Defense counsel stated that if the court was inclined to so rule, the defendant would request to proceed in propria persona. The court summarily rejected such a notion, stating that it was " 'not going to let him proceed pro. per. . . . Not in a death penalty murder trial.' " (*Id.* at p. 217.) Defendant said again that " 'if I receive two new counsel, I would like to go pro. per,' " but the court ignored the remark. (*Ibid.*) On appeal, the People contended that the defendant's request for self-representation was impulsive and conditional, and that his failure to renew it after meeting his newly appointed counsel demonstrated he abandoned any such desire. (*Id.* at pp. 217-219.) We observed, "We need not decide this issue, however, because whether or not defendant's request was equivocal, the trial court's response was not only legally erroneous but also unequivocal, and foreclosed any realistic possibility defendant would perceive self-representation as an available option. Thus, even assuming defendant's request was equivocal, the trial court's response effectively prevented defendant from making his invocation unequivocal." (*Id.* at p. 219.)

Unlike in *Dent*, defendant's statements here "cannot be deemed to have constituted an articulate and unmistakable demand for *self*-representation." (*Valdez, supra*, 32 Cal.4th at p. 100, italics added [distinguishing *Dent*].) Further, the court did not act without due reflection. To the contrary, it carefully probed defendant's intent. It was defendant, not the court, who unambiguously and repeatedly dismissed any notion that he wished to try his own case. This record "underscores the point that defendant understood that he could, if he wished, make a request to represent himself in this case." (*Valdez*, at p. 101.) He did not do so.

37

"Because defendant failed to ' "articulately and unmistakably demand to proceed *pro se*," ' we conclude he never invoked his *Faretta* right." (*Valdez, supra*, 32 Cal.4th at p. 99.) There was no Sixth Amendment violation.

### 2. *Rejection of defendant's supplemental penalty phase instructions*

The court gave CALJIC Nos. 8.85 and 8.88 explaining penalty determination, the nature of aggravation and mitigation, and the weighing of those factors. It refused several of defendant's supplemental instructions regarding the jury's consideration of mercy, sympathy, and compassion (proposed instruction Nos. 2, 3, 4), the concept of lingering doubt (proposed instruction Nos. 12, 13, 14, 15), mental and emotional disturbance (proposed instruction No. 18), mitigating circumstances (proposed instruction Nos. 1, 2, 16), and aggravating factors (proposed instruction Nos. 6, 17). Defendant contends that these instructions were necessary to guide the jury in its consideration and weighing of mitigating and aggravating factors, and in its making the constitutionally required individualized moral assessment of the appropriate penalty to impose. He asserts that the erroneous refusal of the instructions violated his state and federal constitutional rights to a fair trial, presentation of a defense, equal protection, and the return of a reliable, nonarbitrary, and individualized penalty determination. As explained below, the court properly refused all but one of the proposed instructions. The single omission was not reasonably likely to have misled the jury.

### a. *Instructions on mercy, sympathy, and compassion*

Defendant proposed three special instructions on the role of compassion, sympathy, and mercy in the penalty phase deliberations:

38

"A juror is further permitted to use mercy, sympathy and/or sentiment in deciding what weight to give each mitigating factor." (Proposed instruction No. 2, ¶ 3.)

"A mitigating circumstance does not constitute a justification or excuse for the offense in question. A mitigating circumstance is a fact about the offense, or about the defendant which in fairness, sympathy, compassion or mercy may be considered in extenuating or reducing the degree of moral culpability or which justifies a sentence less than death, although it does not justify or excuse the offense." (Proposed instruction No. 3.)

"If a mitigating circumstance or aspect of the defendant's background or his character arouses mercy, sympathy, empathy or compassion such as to persuade you that death is not the appropriate penalty, you must act in response thereto and impose a sentence of life without possibility of parole." (Proposed instruction No. 4.)

The court rejected these instructions as duplicative of the standard CALJIC instructions. It also found proposed instruction No. 4 argumentative.

There was no error. The court must instruct "on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case." (*Benavides, supra,* 35 Cal.4th at p. 111.) "We previously have explained that the standard CALJIC penalty phase instructions 'are adequate to inform the jurors of their sentencing responsibilities in compliance with federal and state constitutional standards.'" (*Gurule, supra,* 28 Cal.4th at p. 659, quoting *Barnett, supra,* 17 Cal.4th at pp. 1176-1177.) Moreover, the court may refuse a proffered instruction that is incorrect, argumentative, or duplicative. (*Gurule*, at p. 659.)

CALJIC No. 8.88 (6th ed. 1996) told the jury that "[a] mitigating circumstance is any fact, condition or event which does not constitute a

39

justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. [¶] . . . You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." CALJIC No. 8.85 listed the mitigating factors set for in section 190.3, and additionally told the jury to consider "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (CALJIC No. 8.85, factor (k) (6th ed. 1996).) "We have concluded that CALJIC No. 8.85 adequately instructs the jury concerning the circumstances that may be considered in mitigation, including sympathy and mercy." (*People v. Burney* (2009) 47 Cal.4th 203, 261, accord, *People v. Brown* (2003) 31 Cal.4th 518, 570 (*Brown*).) Proposed instruction Nos. 2 and 3 are duplicative of the CALJIC instructions given.

Defendant urges us to reconsider this authority because, in his view, reference to "sympathy" does not carry the same meaning as "compassion" or "mercy." We decline the invitation. The words "sympathy" and "compassion" are functional synonyms. (Roget's II, The New Thesaurus (3d ed. 2003) pp. 183, 993.) Defendant fails to articulate a meaningful distinction between them. As for mercy, we repeatedly have cautioned against using that word in the penalty phase instructions, explaining, "[t]he unadorned use of the word 'mercy' implies an arbitrary or capricious exercise of power rather than reasoned discretion based on particular facts and circumstances." (*People v. McPeters* (1992) 2 Cal.4th 1148, 1195, superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106; accord, *People v. Lewis* (2001) 26 Cal.4th 334, 393.) Moreover, the court did not foreclose defense

40

counsel from urging the jury to show sympathy and mercy to defendant. (See

*Lewis*, at p. 393.) No modified instruction was warranted.

### b. *Instructions on lingering doubt*

Defendant proposed four instructions on the concept of lingering doubt.[21]

The court refused them because the language of CALJIC No. 8.85, factor (k) was

---

[21] Specifically, the proposed instructions provided:

"While you may not now acquit Kevin Boyce of either murder or the special circumstances, you may evaluate the evidence presented in light of determining which punishment shall be imposed. This includes any doubts you may entertain on the question of guilt or the circumstances of the defendant's involvement and participation in the crimes, including but, not limited to, the issue of the identification of the actual person who shot Mr. York. This is called lingering or residual doubt. The concept of lingering or residual doubt exists somewhere between absolute truth and reasonable doubt.

"You were previously required to find each element of the charges and the special circumstances beyond a reasonable doubt. However, as you were instructed previously, reasonable doubt is not a mere possible doubt; because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. Thus you may have had a doubt as to his guilt or the appropriate participation or involvement and therefore culpability level in the crimes, but concluded it was not a reasonable doubt.

"Before determining the appropriate penalty to be imposed upon Kevin Boyce you may determine if the People have proven the case based upon a higher standard than reasonable doubt. Only you are the judges of what standard of proof must be met before imposing a sentence of death in light of all of the instructions the court has given you. However, you may determine, aside from any other mitigation evidence presented, that there is some doubt, and based upon that finding impose a sentence of life without possibility of parole." (Proposed instruction No. 12.)

"The adjudication of guilt is not infallible and any lingering doubts you entertain on the question of guilt or culpability level may be considered by you in determining the appropriate penalty, including the possibility that at some time in the future, facts may come to light which have not yet been discovered.

"It may be considered as a factor in mitigation if you have a lingering doubt as to the guilt or culpability level of the defendant." (Proposed instruction No. 13.)

*(footnote continued on next page)*

41

sufficient and defense counsel could argue the concept of lingering doubt to the jury.

We have often rejected the claim that the court must instruct on lingering doubt.  (*People v. Millwee* (1998) 18 Cal.4th 96, 165; *People v. Sanchez* (1995) 12 Cal.4th 1, 77, disapproved on another ground in *Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.)  Although the jurors may consider lingering doubt in reaching a penalty determination, there is no requirement under state or federal law that the court specifically instruct that they may do so.  (*Brown, supra,* 31 Cal.4th at p. 567; *Sanchez*, at p. 77; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1187.) CALJIC No. 8.85, factor (k) tells the jury that it may consider "[*a*]*ny* other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and *any* sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, *whether or not* related to the offense for which he is on trial."  (Italics added.)  That instruction sufficiently encompasses the concept of lingering doubt.

---

*(footnote continued from previous page)*

"The adjudication of guilt is not infallible, and any lingering doubts you entertain on the question of guilt, or level of participation and involvement in the crimes, or the circumstances of defendant's participation and involvement in the crimes may be considered by you in determining the appropriate penalty.  The weight such lingering doubts should carry, if any, is for you to determine." (Proposed instruction No. 14.)

"Each individual juror may consider as a mitigating factor residual or lingering doubt as to whether defendant intentionally and/or personally killed the victim.  Lingering or residual doubt is defined as the state of mind between beyond a reasonable doubt and beyond all possible doubts.

"Thus, if any individual juror has a lingering or residual doubt about whether the defendant intentionally and/or personally killed the victim, he or she must consider this as a mitigating factor and assign to it the weight you deem appropriate." (Proposed instruction No. 15.)

(*Brown*, at p. 568; *Sanchez*, at pp. 77-78; *Rodrigues*, at p. 1187.)  Furthermore, counsel argued in closing that a juror with lingering doubt that defendant was the shooter should consider that doubt as mitigation.  In light of the standard instructions and counsel's argument, the concept was well covered.  (*Sanchez*, at p. 78.)

### c. Mitigating circumstances

Defendant challenges the court's rejection of several proposed instructions on mitigating circumstances.  There was no error.

Defendant proposed a special instruction that mental or emotional disturbance from any cause, including consumption of drugs or mental illness, is a mitigating circumstance.  (Proposed instruction No. 18.)[22]  The court found that CALJIC No. 8.85 adequately covered the topic of mental or emotional disturbance.  It also concluded the proffered instruction was argumentative and unsupported by substantial evidence that defendant was on drugs during the murder.

---

[22]    Specifically, the proposed instruction provided:
"A person may be under the influence of mental or emotional disturbance even though his mental and emotional disturbance was not so strong as to preclude deliberation or premeditation.

"Mental and emotional disturbance may result from any cause or may exist without apparent cause.

"For this mitigating circumstance to exist, it is sufficient that the defendant's mind or emotions were disturbed, from any cause, whether from consumption of drugs, mental illness, or other cause, and that he was under the influence of that disturbance when he killed.  A person would be under the influence of mental or emotional disturbance if a mental or emotional condition existed which influenced his conduct so as to make it different than it otherwise would have been.

"So, if you are satisfied from the evidence that defendant was under the influence of mental or emotional disturbance, from any cause, then it would be your duty to find this a mitigating circumstance."

CALJIC No. 8.85, factor (d) told the jury to consider "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." Factor (h) of that instruction told the jury to consider "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect or the effects of intoxication." Factor (k) of the instruction told the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."

In *People v. Williams* (2006) 40 Cal.4th 287, 325-326 the defendant requested a special instruction nearly identical to the one proposed here. We upheld the court's refusal to give the "rather confusing" instruction, observing that it would not have clarified the standard CALJIC instruction respecting section 190.3, factor (h). (*Williams*, at p. 326; accord, *People v. Rogers* (2006) 39 Cal.4th 826, 898-899.)

Defendant protests that factors (d) and (h) in CALJIC No. 8.85 did not specifically identify mental or emotional disturbance as a *mitigating* factor. He further argues that the "instruction's reference [in factor (k)] to 'the defendant's character' does not clearly cover the evidence of brain damage and mental illness introduced by appellant." The argument fails. The "penalty phase jury instructions need not explicitly label a factor such as extreme mental or emotional disturbance as mitigating, provided there is no reasonable likelihood jurors misunderstood the instruction in a way that violated defendant's rights . . . ." (*People v. Dunkle* (2005) 36 Cal.4th 861, 924, disapproved on another ground in *Doolin, supra*, 45 Cal.4th at p. 421, fn. 22; accord, *People v. Rogers, supra,* 39

44

Cal.4th at p. 897.)  The standard instructions refer to extreme mental or emotional disturbance, impairment from mental disease or defect, and any other sympathetic aspect of defendant's situation as relevant penalty factors.  Defendant presented extensive evidence in the guilt and penalty phases on these topics.  Counsel argued that such evidence should be considered in mitigation.  There is no reasonable likelihood the jurors would have interpreted the instructions to impermissibly limit their consideration of this evidence.  (*Boyde v. California* (1990) 494 U.S. 370, 380-383.)[23]

Defendant proposed an addition to CALJIC No. 8.88 (6th ed. 1996), which read in part:  "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."  Defendant asked the court to define the word " '[s]ubstantial[]' as . . . considerably, essentially or materially."  (Proposed instruction No. 1.)  He also proposed two other instructions:  "The mitigating circumstances that I have read for your consideration are given merely as examples of some of the factors that a juror may take into account as reasons for deciding not to impose a death sentence in this case.  A juror should pay careful attention to each of those factors.  Any one of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case.  But a juror should not limit his or her

---

[23]    Defendant observes that the jury may consider mental illness or defects as a mitigating factor even if the defendant is not hallucinating at the time of the offense.  (See *People v. Yeoman* (2003) 31 Cal.4th 93, 146.)  As we observed in *Yeoman*, CALJIC No. 8.85, factor (k) covers this circumstance.  (*Yeoman*, at p. 146.)  Notably, defendant's proposed instruction would have directed the jury to consider whether he was acting under the influence of mental or emotional disturbance "when he killed" the victim, and thus was narrower than the standard instruction.

consideration of mitigating circumstances to these specific factors. A juror may also consider any other circumstances relating to the case or to the defendant as shown by the evidence as reasons for not imposing the death penalty. [¶] A mitigating circumstance does not have to be proved beyond a reasonable doubt. A juror may find that a mitigating circumstance exists if there is any evidence to support it no matter how weak the evidence may be. Any mitigating circumstance may outweigh all the aggravating factors. [¶] A juror is further permitted to use mercy, sympathy and/or sentiment in deciding what weight to give each mitigating factor." (Proposed instruction No. 2.)

"The mitigating circumstances which I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death sentence on Mr. Boyce. You should not limit your consideration of mitigating circumstances to these specific factors. You may also consider any other circumstances presented as reasons for not imposing the death sentence. [¶] This includes, but is not limited to, any other circumstance which extenuates the gravity of the crime even though it is not a [*sic*] excuse for the crime, and any other factor proffered by the defendant as a factor in mitigation of the penalty." (Proposed instruction No. 16.)

The court rejected these proposals, finding that the word "substantial" was commonly understood, and that the second and third instructions duplicated standard CALJIC instructions.

There was no error. The word "substantial" is not vague, overbroad, or ambiguous. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1361; *People v. Breaux* (1991) 1 Cal.4th 281, 315 (*Breaux*).) It requires no further definition, is readily understandable, and has no technical meaning peculiar to the law. The words " 'so substantial' " " 'plainly convey the importance of the jury's decision and emphasize that a high degree of certainty is required for a death verdict.' "

46

(*People v. Jackson* (1996) 13 Cal.4th 1164, 1243.)  Accordingly, no further instruction as to their meaning was required.  (*People v. Hardy* (1992) 2 Cal.4th 86, 153; *People v. Anderson* (1966) 64 Cal.2d 633, 639.)

The other two instructions were properly rejected as superfluous.  CALJIC No. 8.88 explained that "[a] mitigating circumstance is any fact, condition or event which does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty."  After setting out specific factors, CALJIC No. 8.85, factor (k) told the jury that it could consider "[*a*]*ny* other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."  (Italics added.)  In addition, the court gave another of defendant's proposed special instructions that read, "[a]n individual juror may consider something as a mitigating factor even if none of the other jurors consider that factor to be mitigating" and that "[w]hat is a mitigating circumstance or not and the weight to be given the existence or non existence of any circumstance is up to each individual juror."  CALJIC No. 8.88 read, in part: "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

Given these standard and special instructions, there was no obligation to further instruct that the mitigating factors listed in CALJIC No. 8.85 are only examples and that the jury could consider other circumstances presented by the defendant.  The instructions already covered those points.  (*People v. Lucero* (2000) 23 Cal.4th 692, 729 (*Lucero*); *People v. Hines* (1997) 15 Cal.4th 997, 1068-1069.)  Nor was the court required to instruct that any mitigating factor may,

47

standing alone, support a decision that death is not the appropriate penalty, a topic already covered in CALJIC No. 8.88. (See *People v. Bolin* (1998) 18 Cal.4th 297, 343; *Breaux, supra,* 1 Cal.4th at pp. 316-317.) It would have been argumentative to instruct, as defendant requested, that any mitigating circumstance could outweigh all of the aggravating circumstances. (*Hines*, at p. 1069.) Finally, the court was not required to instruct that mitigating evidence need not be proved beyond a reasonable doubt. (*People v. Samayoa* (1997) 15 Cal.4th 795, 862; *Hines*, at p. 1068; *People v. Bonillas* (1989) 48 Cal.3d 757, 790.) We reaffirm these holdings.

### d. Aggravating circumstances

Defendant proposed two instructions on the weighing of aggravating circumstances. The first instruction read: "In deciding whether you should sentence the defendant to life imprisonment without the possibility of parole, or to death, you cannot consider as an aggravating factor any fact which was used by you in finding him guilty of murder in the first degree unless that fact establishes something in addition to an element of the crime of murder in the first degree. [¶] The fact that you have found Kevin Boyce guilty beyond a reasonable doubt of the crime of murder in the first degree and attendant special circumstances is not itself an aggravating circumstance." (Proposed instruction No. 6.)

This instruction was wrong. "[S]ection 190.3, factor (a) expressly permits the jury to consider at the penalty phase the circumstances of the crime and the existence of any special circumstances it finds true." (*Moon, supra,* 37 Cal.4th at p. 40.) " 'The argument to the contrary reveals "a 'basic misunderstanding' of the statutory scheme since, in order to perform its moral evaluation of whether death was the appropriate penalty, the facts of the murder 'cannot comprehensively be withdrawn from the jury's consideration . . . .' " ' " (*People v. Earp* (1999) 20

48

Cal.4th 826, 900-901, quoting *People v. Hawkins* (1995) 10 Cal.4th 920, 965-966.)

Defendant's second proposed instruction read: "You must not consider as an aggravating factor the existence of any special circumstance if you have already considered the facts of the special circumstance as a circumstance of the crime for which the defendant has been convicted. In other words, do not consider the same factors more than once in determining the presence of aggravating factors." (Proposed instruction No. 17.) The instruction was offered to supplement CALJIC No. 8.85, factor (a), which told the jury it could consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true."

The court refused the instruction as misleading and confusing, but indicated that counsel could craft another instruction relating to "double counting." This ruling was error, as we later held in *People v. Monterroso* (2004) 34 Cal.4th 743 (*Monterroso*). That case approved the same language proposed here as a correct statement of the law and held that "[a] trial court should, when requested, instruct the jury against double-counting these circumstances." (*Id*. at p. 789; accord, *People v. Melton* (1988) 44 Cal.3d 713, 768 (*Melton*).)

Nonetheless, there is no reasonable likelihood the jury was misled by the omission. In *Melton, supra*, 44 Cal.3d 713, we observed, "The literal language of [factor] (a) presents a theoretical problem . . . since it tells the penalty jury to consider the 'circumstances' of the capital crime *and* any attendant statutory 'special circumstances.' Since the latter are a subset of the former, a jury given no clarifying instructions might conceivably double-count any 'circumstances' which were also 'special circumstances.' . . . [¶] However, the possibility of actual prejudice seems remote . . . ." (*Id*. at p. 768.) *People v. Ayala* (2000) 24 Cal.4th 243 (*Ayala*) clarified that the instructional omission was at most potentially

49

misleading about the permissibility of double counting.  (*Id*. at p. 289.)  " 'When reviewing a supposedly ambiguous . . . jury instruction, " 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " ' " (*Ibid*., quoting *People v. Welch* (1999) 20 Cal.4th 701, 766.)

As in *Ayala*, there is no such reasonable likelihood here.  (*Ayala*, *supra*, 24 Cal.4th at p. 289.)  The instruction " 'do[es] not inherently encourage the double counting of aggravating factors.' " (*Ibid*.)  Indeed, "[e]xercising common sense" the jury was unlikely to believe that it should place a single aggravating circumstance "twice on the penalty 'scale.' " (*Melton, supra,* 44 Cal.3d at p. 769; accord, *Monterroso, supra*, 34 Cal.4th at p. 790.)  Nor did the prosecutor exploit any ambiguity in closing argument.  He simply emphasized that defendant committed a burglary and a robbery, and murdered a peace officer.  He did not encourage the jury to categorize such facts as circumstances of the crime or aggravating circumstances, or to count them twice.

### 3. *Failure to reinstruct jury at penalty phase*

The court gave CALJIC No. 8.84.1 (6th ed. 1996), which provided in part that "[y]ou will now be instructed as to all of the law that applies to the penalty phase of this trial" and to "[d]isregard all other instructions given to you in other phases of this trial."  When this instruction is given, the court must later reinstruct the jury with those guilt phase instructions necessary to its determination of the penalty phase issues.  (*People v. Carter* (2003) 30 Cal.4th 1166, 1219 (*Carter*); *Moon, supra*, 37 Cal.4th at p. 37.)  The failure to do so constitutes "an error at the penalty phase of a capital trial" which, under state law, "is prejudicial if 'there is a reasonable *possibility* the error affected the verdict.' [Citation.]  This test is effectively the same as that under *Chapman v. California* (1967) 386 U.S. 18,

which asks whether the error is harmless beyond a reasonable doubt." (*People v. Wilson* (2008) 43 Cal.4th 1, 28.) We examine "the nature of the evidence presented to determine whether it was likely the omitted instructions affected the jury's evaluation of the evidence." (*Moon, supra,* 37 Cal.4th at p. 38.)

Here, the court reread several standard instructions, including CALJIC Nos. 1.02 (statements of counsel—evidence stricken out—insinuations of questions—stipulated facts), 2.20 (believability of witness), 2.21.1 (discrepancies in testimony), 2.80 (expert testimony—qualifications of expert), 2.60 (defendant not testifying—no inference of guilt may be drawn), and 2.61 (defendant may rely on state of evidence).

Defendant identifies several other instructions that he claims should have been given sua sponte at the penalty phase, including CALJIC Nos. 1.01 (consider instructions as a whole), 1.03 (no independent investigation), 1.05 (use of notes), 2.00 (direct and circumstantial evidence), 2.01 (sufficiency of circumstantial evidence), 2.02 (circumstantial evidence to prove specific intent or mental state), 2.03 (falsehood as consciousness of guilt), 2.11 (production of all available evidence not required), 2.13 (prior consistent or inconsistent statement), 2.21.2 (witness willfully false), 2.22 (weighing conflicting testimony), 2.27 (sufficiency of single witness), 2.81 (lay opinion), and 2.82 (hypothetical questions). He also contends that the court erred in failing to redefine reasonable doubt as it applied to section 190.3, factor (b): "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." He claims these omissions violated his state and federal constitutional rights to jury trial, due process, equal protection, and a reliable death judgment.

Defendant did not request that the court reread any of the instructions he now identifies on appeal. Nonetheless, he maintains that the court had a duty to

51

reinstruct with " 'all *appropriate* instructions beginning with CALJIC No. 1.01, concluding with CALJIC [No.] 8.88.' " (Quoting Use Note to CALJIC No. 8.84.1 (6th ed. 1996) p. 509, italics added.) However, in the absence of a request, the court need only instruct on general principles of law closely and openly connected to the facts and necessary for the jury's understanding of the case. (*Carter, supra,* 30 Cal.4th at p. 1219.) We have looked to the court's general sua sponte instructional obligation "in all criminal cases" to inform which guilt phase instructions must be reread in the penalty phase after giving CALJIC No. 8.84.1. (*Carter*, at p. 1219.) Defendant provides no reason to impose a broader rule. Accordingly, we limit our review to those instructions that carried a recognized sua sponte obligation at the time of defendant's trial. (*Ibid*.)

The court had a sua sponte duty to warn the jurors against conversing with others or conducting independent investigation. (§ 1122; see CALJIC No. 1.03.) The court gave CALJIC No. 1.03 in the guilt phase, but did not repeat it. Nevertheless, the jury was familiar with its general principles. There is no evidence that any juror discussed the case with others or conducted any investigation. (See *People v. Howard* (2010) 51 Cal.4th 15, 38.) On this record there is no reasonable possibility the omission affected the verdict.

The court was required to instruct on circumstantial evidence (*People v. Bloyd* (1987) 43 Cal.3d 333, 351; *People v. Yrigoyen* (1955) 45 Cal.2d 46, 49; see CALJIC Nos. 2.00, 2.01, 2.02), but only if the prosecution's case rested substantially on such evidence (*Brown, supra,* 31 Cal.4th at pp. 563-564; *People v. Heishman* (1988) 45 Cal.3d 147, 167). Defendant has not identified any circumstantial evidence presented by the prosecution in the penalty phase that would warrant such instructions. Survivors gave direct victim impact testimony. Documents established defendant's felony convictions, and Damani Gray's direct

52

testimony established defendant's assault on him. Accordingly, the instructions were not called for.

Further, there was no possible prejudice. "Unlike defendant, 'we see no reason to assume' [citation] that the jurors would have felt free to evaluate the penalty phase evidence in a vacuum, rather than carefully and deliberately, as they apparently had evaluated the guilt phase evidence. Nothing in the closing arguments of the parties suggested that the jurors were free to make a standardless assessment of the evidence. Nor did the jurors ask any questions or request clarification as to how to assess any of the penalty phase evidence. [Citation.] In the absence of some specific indication of prejudice arising from the record, defendant 'does no more than speculate' [citation] that the absence of the instructions prejudiced him." (*People v. Lewis* (2008) 43 Cal.4th 415, 535, quoting *Carter, supra,* 30 Cal.4th at p. 1221.)

The court was required to instruct the jury, when relevant, on evaluating conflicting testimony and reliance on a single witness to prove a fact at issue. (*Carter, supra,* 30 Cal.4th at p. 1219; *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 884-885; see CALJIC Nos. 2.22, 2.27.) Again, defendant fails to identify any evidence introduced in the penalty phase that would warrant these instructions. The prosecution cross-examined defendant's expert witnesses and family members, but did not introduce conflicting expert testimony or character witnesses. Similarly, defendant introduced evidence to impeach the credibility of prosecution witness Damani Gray, but did not introduce testimony in conflict. Neither side relied exclusively on a single witness to prove circumstances in aggravation or mitigation. Two witnesses testified about the Damani Gray assault. There were four victim impact witnesses. Defendant's numerous experts and family members testified consistently about his background and their evaluation of his mental and intellectual status.

53

Finally, the court was required to define reasonable doubt. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 328; § 1096; see CALJIC No. 2.90.) The omission here was harmless. The jury was instructed to apply the reasonable doubt standard to evidence of defendant's prior felony convictions and unadjudicated violent criminal activity. (CALJIC Nos. 8.86 and 8.87.) Proof beyond a reasonable doubt was defined in the guilt phase. The jury did not request further clarification at the penalty phase. "There is no reasonable possibility the jury would have believed that the reasonable doubt standard it was required to apply at the penalty phase was any different than the standard it had just applied at the guilt phase . . . ." (*People v. Lewis, supra,* 43 Cal.4th at p. 536; accord, *People v. Chatman* (2006) 38 Cal.4th 344, 407-408.) Contrary to defendant's claim, the court's failure to again define reasonable doubt did not violate his federal constitutional rights. Although the reasonable doubt *standard* is a requirement of due process, the federal Constitution does not require courts to define it as a matter of course. (*Victor v. Nebraska* (1994) 511 U.S. 1, 5; accord, *People v. Aranda* (2012) 55 Cal.4th 342, 374.) Nor does it require that aggravating circumstances be proved beyond a reasonable doubt in the penalty phase of a capital trial. (*People v. Bell* (2007) 40 Cal.4th 582, 620.)

In conclusion, although the court failed to repeat CALJIC Nos. 1.03 and 2.90, there is no reasonable possibility the error affected the verdict. The error was thus harmless.

*4. Execution of defendant with mental and psychological impairments*

*Atkins v. Virginia* (2002) 536 U.S. 304 (*Atkins*) establishes a categorical rule that executing persons with intellectual disabilities[24] violates the Eighth Amendment's prohibition against cruel and unusual punishment. (*Atkins*, at pp. 318, 320-321.) Because defendant's trial occurred before *Atkins*, neither the court nor the jury was asked to decide whether defendant is intellectually disabled. In this circumstance "[p]ostconviction claims of [intellectual disability] should be raised by petition for writ of habeas corpus . . . ." (*Hawthorne, supra,* 35 Cal.4th at p. 47; accord, *Jackson, supra,* 45 Cal.4th at pp. 679-680; *People v. Leonard* (2007) 40 Cal.4th 1370, 1428 (*Leonard*).)[25]

---

[24]     *Atkins* employed the term "mentally retarded," as did our opinions. (*Atkins, supra*, 536 U.S. at pp. 306-307; *People v. Jackson* (2009) 45 Cal.4th 662, 679-680 (*Jackson*); *In re Hawthorne* (2005) 35 Cal.4th 40, 43-44 (*Hawthorne*).) More recently, however, the high court used the term "intellectual disability" to describe the identical phenomenon, consistent with the Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013). (*Hall v. Florida* (2014) __ U.S. __ [134 S.Ct. 1986, 1990].) Following *Atkins*, the California Legislature enacted section 1376, which establishes procedures for the determination of mental retardation in preconviction capital cases. In 2012, the Legislature amended the statute to replace the term "mentally retarded" with the term "intellectual disability" without substantive change to the definition. (Stats. 2012, ch. 457, § 42.) We employ the current terminology.

[25]     *Hawthorne* adopted procedures for postconviction *Atkins* claims similar to those set forth in section 1376. Intellectual disability is a term of art, defined as "the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before 18 years of age." (§ 1376, subd. (a); accord, *Hawthorne, supra*, 35 Cal.4th at p. 47.) The standard takes into account fixed intelligence test scores as well as abilities in " ' "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety . . . ." ' " (*Hawthorne,* at p. 48, quoting *Atkins, supra*, 536 U.S. at p. 308, fn. 3.) "It is not measured according to a fixed intelligence test score or a specific adaptive behavior deficiency, but rather constitutes an assessment of the [defendant's] overall capacity based on a consideration of all the relevant evidence." (*Hawthorne,* at p. 49; accord, *Hall v. Florida, supra*, __ U.S. at p. __

*(footnote continued on next page)*

Defendant does not raise an *Atkins* claim on direct appeal. He does, however, ask us to perform intracase proportionality review to determine whether the death judgment is so disproportionate to his crime that it amounts to cruel and/or unusual punishment. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.) Based on the direct appeal record, he argues that his death judgment is unconstitutional in light of his individual characteristics, including his asserted organic brain damage, borderline intelligence, and mental illness. Although defendant did not make this argument below, "the cruel or unusual punishment clause of the California Constitution (art. I, § 17) . . . entitle[s] a capital defendant, on request, to *intracase* review *by this court* to determine whether the death penalty is grossly disproportionate to his personal culpability." (*People v. Anderson* (2001) 25 Cal.4th 543, 602; accord, *People v. Lenart* (2004) 32 Cal.4th 1107, 1130 (*Lenart*).)[26]

On this record, defendant's argument fails. " ' "The cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution prohibits the imposition of a penalty that is disproportionate to the defendant's 'personal responsibility and moral guilt.' [Citations.] Article I, section 17 of the

---

*(footnote continued from previous page)*

[134 S.Ct. at pp. 1993-2001] [invalidating strict cutoff for intellectual disability based on an IQ of 70].) The burden is on defendant to prove his intellectual disability by a preponderance of the evidence. (*Hawthorne*, at p. 50; see § 1376, subd. (b)(3).) Although defendant's experts discussed his IQ scores as a circumstance in mitigation, they did not provide an overall assessment of his capacity to communicate, care for himself, live independently, use community resources, or function in the areas of work, leisure, health, and safety.

[26]     By contrast, "[i]t is settled that *intercase* proportionality review is not required as a matter of due process, equal protection, fair trial, or cruel and/or unusual punishment concerns." (*People v. Anderson, supra,* 25 Cal.4th at p. 602.)

56

California Constitution separately and independently lays down the same prohibition." ' [Citations.] To determine whether a sentence is cruel or unusual under the California Constitution as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including . . . age, prior criminality, and mental capabilities. [Citation.] If the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], so that the punishment ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' [citation], the court must invalidate the sentence as unconstitutional." (*Lucero, supra,* 23 Cal.4th at pp. 739-740.)

We previously have rejected claims that a defendant's low IQ, brain damage, and/or mental illness render his capital sentence grossly disproportionate to his crime. In *People v. Young* (2005) 34 Cal.4th 1149, the 20-year-old defendant, acting alone, callously murdered three men. He shot one man in the back of the head as he tried to run away, shot a second man in the back as he begged for his life on his hands and knees, and shot a third man in the back after he jumped from a window trying to escape. The defendant also attempted to murder two others. We upheld the death sentence despite evidence that the defendant had an IQ of 75, lifelong learning disabilities, and a probable mental disorder. (*Id.* at pp. 1231-1232.)

In *People v. Poggi* (1988) 45 Cal.3d 306, the defendant's death sentence for a brutal rape and murder was upheld notwithstanding that he had "suffered organic brain damage, had a history of mental illness, was schizophrenic, and mentally ill on the day of the murder . . . ." (*Id.* at p. 348.) We concluded, "those factors do not sufficiently reduce his culpability to make the sentence disproportionate. . . .

57

[A] defense psychiatrist[] testified that 'his mental illness was not of such a nature and degree . . . as to negate or diminish his criminal culpability.' [¶] Defendant acted as he did evidently to eliminate a witness and thereby avoid apprehension. He was unspeakably brutal. He was the sole and actual perpetrator, and he killed an innocent young woman." (*Ibid.*)

Here, evidence established the following: Defendant was 26 years old at the time of the crimes. He planned a robbery based on specific information about the targeted business. He armed himself and acted in concert with an armed accomplice. In the salon, the two engaged in organized and focused behavior by ordering the victims to the floor and demanding to know where the money was. When the cash drawer yielded little, defendant took York's ATM card and demanded the PIN. Discovering York's badge, he decided to kill him for an objectively discernible reason. He shot his unresisting victim in the back of the head. He differentiated among his victims, killing York but deciding not to shoot Jennifer because she was a woman. He and Willis fled and took care to hide stolen items and weapons in the car. While defendant and Willis were parked in a lot, having used York's ATM card, the Lamppost pizzeria presented itself as a target. The men again engaged in focused activity. Defendant robbed the patrons and asked if any were in law enforcement. Again the pair fled successfully.

There was no evidence that defendant mindlessly followed Willis's directives or acted with confusion. The two participated equally. After their arrest, defendant recognized, and criticized as implausible, Willis's idea to implicate an unidentified third person. He cautioned Willis to keep his voice down while they discussed their options. He later told police the robberies were his idea.

In denying the automatic motion to modify the verdict of death, the court agreed with the jury's assessment that defendant was the shooter. It found that

58

defendant's crime was motivated by racial hatred and animosity toward the police. It further found that defendant was not acting under the influence of a mental or emotional disturbance. Instead, defendant appreciated the criminality of his conduct and chose his course of action. He demonstrated no remorse.

Although defendant offered evidence of his schizotypal disorder and subaverage intelligence, there was no evidence that either condition played any role in the killing. (*Lucero, supra*, 23 Cal.4th at p. 740; *People v. Arias* (1996) 13 Cal.4th 92, 193.) Indeed, his own experts conceded he could differentiate right from wrong and truth from falsehood. He understood cause and effect. He was capable of making decisions, including the choice to kill. His behavior during the crimes was fully consistent with those conclusions.[27] Additionally, defendant's evidence in mitigation suggested that he had the ability to understand and conform to social norms. His aunt described him as a delightful, rambunctious youngster who did things other normal children did at his age. He was kind to his disabled cousin, and defended her against taunting. He cared for his grandmother and great-grandmother when they were ill. He discouraged his aunt from using cocaine. He expressed pride when she agreed to enter a drug rehabilitation program. He was romantically involved with a woman and cared for two young children, including his own daughter, feeding, dressing, and bathing them. He learned to understand and assimilate into gang culture and advised his cousin about how to avoid provoking gang violence.

---

[27] Defendant maintains that the prosecutor conceded his intellectual disability at trial. We reject his reading of the record. Although the prosecutor did not call his own expert, he did argue that defendant was functioning at a level higher than his IQ scores might suggest: "when we think in our minds about mentally retarded, it is somebody that's functioning much different. Much lower, frankly, than what Mr. Boyce is." He further observed, "Mr. Boyce, he is not a NASA scientist, but he is not the dumbest guy in the world either, because he is cagey."

Both the jury and trial court considered all of this evidence and determined that death was the appropriate punishment. (See *Jackson, supra,* 45 Cal.4th at p. 681 ["The decision in *Atkins* does not . . . alter the mitigating effect of evidence of mental retardation or . . . the circumstances under which an individual juror may vote for a sentence of death"].) "Defendant's individual culpability . . . places him well within the class of murderers for whom the Constitution and the statute permit a sentence of death." (*People v. Arias, supra,* 13 Cal.4th at p. 194; accord, *People v. Crittenden* (1994) 9 Cal.4th 83, 158 [the facts that defendant planned a burglary, rendered the victims helpless, and committed gratuitous and unnecessary acts of cruelty, culminating in their deaths, refuted his claim that the death sentence was arbitrary, discriminatory, and disproportionate].)

Defendant urges this court to determine whether his brain damage, mental illness, and intellectual impairment "place him in a category of offenders for whom capital punishment cannot be imposed," *regardless* of the circumstances of the crime. This approach contradicts our precedent, which considers whether the penalty is "so disproportionate *to the crime for which it is inflicted* that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, italics added; accord, *People v. Cole* (2004) 33 Cal.4th 1158, 1235.) To make such an assessment, we examine *the circumstances of the offense*, including the defendant's motive, the extent of his involvement in the crime, the manner in which it was committed, and the consequences of his acts, as well as the defendant's age, prior criminality, and mental capabilities. (*Cole*, at p. 1235.)

Defendant looks to *Atkins* for support. As noted, there the United States Supreme Court held that the execution of the intellectually disabled violates the Eighth Amendment's proscription against cruel and unusual punishment. (*Atkins, supra,* 536 U.S. at p. 321.) The high court reasoned that such individuals'

60

personal culpability is diminished because, "by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." (*Id*. at p. 318.) Given these impairments, the court categorically exempted intellectually disabled offenders from the death penalty because the societal goals of retribution and deterrence that justify that penalty would not be served. (*Id*. at pp. 319-321.) It also cautioned that such defendants face an enhanced risk of execution due to several factors, including their susceptibility to false confessions, their lesser ability to make a persuasive showing of mitigation, to meaningfully assist counsel, to be effective witnesses on their own behalf, and to convey their remorseful demeanor. (*Id*. at pp. 320-321.)

As defendant recognizes, there is no objective evidence that a national consensus has developed against executing persons with intellectual impairments *short of* intellectual disability or insanity. (See *Ford v. Wainwright* (1986) 477 U.S. 399, 409-410 [prohibiting execution of insane person under the Eighth Amendment].) Indeed, we, along with other state courts, have refused to extend the holding in *Atkins* to certain types of personality disorders or to mental illness in general.[28] We recently explained: "the circumstance that an individual

---

[28]    See, e.g., *People v. Hajek & Vo* (2014) 58 Cal.4th 1144, 1250-1252 (cyclothymic disorder and bipolar disorder, before and during commission of his crimes, as well as a borderline personality disorder with antisocial traits); *People v. Castaneda* (2011) 51 Cal.4th 1292, 1345 (antisocial personality disorder); *Diaz v. State* (Fla. 2006) 945 So.2d 1136, 1150-1152 (mentally ill offenders), overruled on another ground in *Darling v. State* (Fla. 2010) 45 So.3d 444; *Lewis v. State* (Ga. 2005) 620 S.E.2d 778, 786 (mentally ill offenders); *State v. Johnson* (Mo. 2006) 207 S.W.3d 24, 50-51 (mentally ill offenders); *State v. Hancock* (Ohio 2006) 840 N.E.2d 1032, 1059-1060 (severely mentally ill offenders); *Commonwealth v. Baumhammers* (Pa. 2008) 960 A.2d 59, 96-97 (mentally ill

*(footnote continued on next page)*

committed murder while suffering from a serious mental illness that impaired his judgment, rationality, and impulse control does not necessarily mean he is not morally responsible for the killing. There are a number of different conditions recognized as mental illnesses, and the degree and manner of impairment in a particular individual is often the subject of expert dispute. Thus, while it may be that mentally ill offenders who are utterly unable to control their behavior lack the extreme culpability associated with capital punishment, there is likely little consensus on which individuals fall within that category or precisely where the line of impairment should be drawn. Thus, we are not prepared to say that executing a mentally ill murderer would not serve societal goals of retribution and deterrence. We leave it to the Legislature, if it chooses, to determine exactly the type and level of mental impairment that must be shown to warrant a categorical exemption from the death penalty." (*People v. Hajek & Vo, supra*, 58 Cal.4th at p. 1252.)

Defendant effectively "asks us to establish a new, ill-defined category of murderers who would receive a blanket exemption from capital punishment without regard to the individualized balance between aggravation and mitigation in a specific case." (*State v. Hancock, supra,* 840 N.E.2d at pp. 1059-1060.) We decline the invitation.

For the same reasons, we reject defendant's equal protection and due process claims. "The equality guaranteed by the equal protection clauses of the federal and state Constitutions is equality under the same conditions, and among

---

*(footnote continued from previous page)*

offenders); *Mays v. State* (Tex. Crim.App. 2010) 318 S.W.3d 368, 379-380 & fn. 23 (mentally ill offenders); cf. *In re Neville* (5th Cir. 2006) 440 F.3d 220, 221 (mentally ill offenders).

persons similarly situated." (*Adams v. Commission on Judicial Performance* (1994) 8 Cal.4th 630, 659.) "It does not mean, however, that ' "things . . . different in fact or opinion [must] be treated in law as though they were the same." [Citation.]' " (*People v. Guzman* (2005) 35 Cal.4th 577, 591.) As *Atkins* recognized, defendants with established intellectual disabilities present unique circumstances. By contrast, the Legislature could rationally conclude the permissible goals of retribution and deterrence are furthered by imposing the death penalty on murderers whose mental states do not amount to an intellectual disability. (Cf. *People v. Hajek & Vo, supra,* 58 Cal.4th at pp. 1251-1252; *People v. Castaneda, supra*, 51 Cal.4th at p. 1345; *Matheney v. State* (Ind. 2005) 833 N.E.2d 454, 458; see *Heller v. Doe* (1993) 509 U.S. 312, 314-315, 319-321 [applying rational basis review to an equal protection claim involving commitment of mentally retarded persons].)

Because defendant's case was litigated before *Atkins* was decided (*Atkins, supra*, 536 U.S. at pp. 318, 320-321), the facts supporting his claim were not fully litigated. His argument involving his intellectual disability "can be determined only in a habeas corpus petition." (*Leonard, supra,* 40 Cal.4th at p. 1428; accord, *In re Hawthorne, supra,* 35 Cal.4th at pp. 47-51.) We reject defendant's intracase proportionality challenge without prejudice to the filing of such a petition, and we express no opinion on the merits of that claim.

### 5. *Constitutionality of California's death penalty scheme*

Defendant mounts various challenges to California's death penalty law that we previously have rejected. Those precedents stand.

The death penalty law adequately narrows the class of death-eligible defendants. (*People v. Myles* (2012) 53 Cal.4th 1181, 1224; *People v. Burgener* (2003) 29 Cal.4th 833, 884 & fn. 7.)

63

The jury's consideration of the circumstances of the crime (§ 190.3, factor (a)) does not permit imposition of a death sentence in an arbitrary and capricious manner in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 149 (*DeHoyos*); *People v. Jennings* (2010) 50 Cal.4th 616, 688-689.)

California's death penalty law does not violate the Sixth Amendment right to a jury trial, the Eight Amendment prohibition against cruel and unusual punishment, or the Fourteenth Amendment right to due process for failing to require proof beyond a reasonable doubt that aggravating factors exist, outweigh the mitigating factors, and render death the appropriate punishment. (*DeHoyos, supra,* 57 Cal.4th at pp. 149-150; *Blair, supra,* 36 Cal.4th at p. 753.) "The federal Constitution is not violated by the failure to require a penalty phase jury to reach unanimity on the presence of aggravating factors (*People v. Martinez* (2009) 47 Cal.4th 399, 455), or on whether prior violent criminal activity has been proved. (*People v. Clark, supra,* 52 Cal.4th at p. 1007.)" (*DeHoyos, supra*, 57 Cal.4th at p. 150.) The high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 and *Ring v. Arizona* (2002) 536 U.S. 584 do not change this result. (*People v. Ward* (2005) 36 Cal.4th 186, 221-222; *People v. Prieto* (2003) 30 Cal.4th 226, 275.)

The court was not required to instruct that the prosecution bears the burden of persuasion to establish that aggravating factors exist and that they outweigh mitigating factors. (*Lenart, supra,* 32 Cal.4th at pp. 1136-1137.) Nor was the court required to articulate the converse, that there is no burden of proof at the penalty phase. (*Streeter, supra,* 54 Cal.4th at p. 268.) Defendant was not entitled to an instruction that there is a presumption in favor of life without parole. (*People v. Arias, supra,* 13 Cal.4th at p. 190.)

CALJIC No. 8.88's directive that jurors may impose a death sentence only if the aggravating circumstances are "so substantial" in comparison to the mitigating circumstances that death is warranted is not unconstitutionally vague. (*People v. Carrington* (2009) 47 Cal.4th 145, 199.)  Nor, conversely, is there any need to instruct that if the mitigating circumstances outweigh the aggravating circumstances, the jury must impose a sentence of life without parole.  (*People v. Fuiava* (2012) 53 Cal.4th 622, 733; *People v. Duncan* (1991) 53 Cal.3d 955, 978.) CALJIC No. 8.88's language instructing the jury "to consider whether the circumstances 'warrant[]' death, rather than if death is the 'appropriate' penalty," does not violate the Eighth and Fourteenth Amendments.  (*DeHoyos, supra*, 57 Cal.4th at p. 150.)

Use of the adjective "extreme" to describe mitigating factors (d) and (g) of section 190.3 does not unconstitutionally erect a barrier to the jury's consideration of mitigating evidence.  (*People v. Clark, supra,* 52 Cal.4th at p. 1007.)  The court need not instruct the jury that mitigating factors can be considered only in mitigation, or to omit mitigating factors that do not apply to defendant's case. (*DeHoyos, supra*, 57 Cal.4th at p. 150.)

"The absence of written or other specific findings by the jury regarding aggravating factors did not deprive defendant of his federal due process and Eighth Amendment rights to meaningful appellate review, violate equal protection of the laws or violate defendant's Sixth Amendment right to trial by jury." (*DeHoyos, supra*, 57 Cal.4th at p. 150; accord, *People v. Parson* (2008) 44 Cal.4th 332, 370.)

The federal Constitution does not require intercase proportionality review. (*People v. Harris* (2008) 43 Cal.4th 1269, 1322-1323.)

"California's capital sentencing procedures do not violate principles of equal protection of the law on the ground they provide safeguards different from

those found in noncapital cases." (*People v. Williams* (2008) 43 Cal.4th 584, 650; accord, *People v. Cox* (1991) 53 Cal.3d 618, 691, disapproved on another ground in *Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.)

Finally, "[i]nternational law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511.)

### C. *Determinate Sentencing Issues*

Defendant was sentenced to 34 years and four months in prison for his convictions on counts 2 through 11.[29]  The determinate sentence was stayed pending execution of the death judgment.

Defendant argues that the determinate sentence must be vacated and the case remanded for resentencing because the court (1) imposed upper terms on count 2 (robbery of Jennifer Parish) and its enhancement, based on an aggravating circumstance not found true by the jury (*Cunningham v. California* (2007) 549 U.S. 270, 288-289) (*Cunningham*); and (2) failed to state reasons for imposing consecutive sentences.  The first claim has merit.  As explained, the sentence on count 2 and its enhancement is conditionally modified.  The second claim was forfeited below.

---

[29]    The court calculated the sentence as follows:  The upper term of five years on count 2 (robbery), with a consecutive upper term of 10 years for the gun enhancement; on counts 3, 5, 6, and 8 (robbery), one-third the midterm (one year) and one-third of the gun enhancement (one year four months); on counts 4 and 11 (burglary), one-third the midterm (eight months) and one-third the gun enhancement (one year four months); on counts 7, 9, and 10 (attempted robbery) one-third the midterm (eight months) and one-third the gun enhancement (one year four months).  All determinate sentences were ordered to run consecutively.

*1. Right to a jury determination of aggravating factors*

At the time of defendant's offenses in 1997, as now, second degree robbery was punishable by two, three, or five years in prison. (§ 213, subd. (a)(2).) An enhancement under former section 12022.5, subdivision (a)(1) was, and continues to be, punishable by three, four, or 10 years in prison (former § 12022.5, subd. (a)(1), as amended by Stats. 1995, ch. 377, § 9, p. 1950, repealed and reenacted without substantive change; see now § 12022.5, subd. (a)).

In 1997, section 1170, subdivision (b) provided that "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime." (Stats. 1995, ch. 49, § 1, p. 125.) The presumptive midterm applied both to the substantive offense and the accompanying enhancement. (See former section 1170.1, subd. (d) as amended by Stats. 1994, ch. 1188, § 12.3, p. 7196 [in imposing additional terms under various statutes, including former section 12022.5, "the court shall apply the sentencing rules of the Judicial Council"]; Cal. Rules of Court, former rule 428(b) ["When the defendant is subject to an enhancement that was charged and found true for which three possible terms are specified by statute, the middle term shall be imposed unless there are circumstances in aggravation or mitigation . . . ."];[30] accord,

---

[30] California Rules of Court, former rule 428(b) was invalidated on another ground in *People v. Hall* (1994) 8 Cal.4th 950, 963.

In 2002, section 1170.1, subdivision (d) was amended to expressly codify the valid portion of California Rules of Court, former rule 428(b). The amendment provided: "If an enhancement is punishable by one of three terms, the court shall impose the middle term unless there are circumstances in aggravation or mitigation, and state the reasons for its sentence choice, other than the middle term, on the record at the time of sentencing." (Stats. 2002, ch. 126, § 1, p. 691.)

In response to the United States Supreme Court's decision in *Cunningham, supra*, 547 U.S. 270, the Legislature amended sections 1170, subdivision (b) and

*(footnote continued on next page)*

67

*People v. Scott* (1994) 9 Cal.4th 331, 350, fn. 13 (*Scott*); *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1779.)

In *Cunningham, supra,* 549 U.S. 270, the United States Supreme Court held that California's determinate sentencing scheme did not comport with the Sixth Amendment jury trial right. As *Cunningham* explained, "the Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." (*Id.* at pp. 274-275.) The court observed that "California's [determinate sentencing law (DSL)], and the Rules governing its application, direct the sentencing court to start with the middle term, and to move from that term only when the court itself finds and places on the record facts—whether related to the offense or the offender— beyond the elements of the charged offense." (*Id.* at p. 279, discussing former § 1170, subd. (b) and Cal. Rules of Court, rule 4.420(a).) "In accord with *Blakely* [*v. Washington* (2004) 542 U.S. 296], therefore, the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum." (*Cunningham*, at p. 288.) "Because the DSL authorizes the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent." (*Id.* at p. 293.)

At sentencing, the court explained that its decision to impose the upper terms on count 2 and its enhancement was "because of the vulnerability of the

_____

*(footnote continued from previous page)*

1170.1, subdivision (d). (Stats. 2007, ch. 3, § 2, pp. 4-5; Stats. 2009, ch. 171, § 5, p. 2918.) As discussed *post* at page 72, those amendments eliminated the requirement that the trial court start with the middle term, and instead authorized the court to impose any of the three possible terms in its discretion.

victims." As defendant points out, the jury made no finding on this factor, and defendant did not admit it.

Relying on *People v. Black* (2007) 41 Cal.4th 799 (*Black*), the People argue that *Cunningham* was satisfied because the court imposed the upper term based on defendant's recidivism, a factor that need not be proven to the jury. (*Black*, at p. 818; *Almendarez-Torres v. United States* (1998) 523 U.S. 224, 243.) In *Black* we held that "so long as a defendant is *eligible* for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any number of aggravating circumstances in exercising its [own] discretion to select the appropriate term by balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury. 'Judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the indictment, jury-trial, and reasonable-doubt components of the Fifth and Sixth Amendments.' " (*Black*, at p. 813, quoting *Harris v. United States* (2002) 536 U.S. 545, 558, *Harris* overruled by *Alleyne v. United States* (2013) __ U.S. __ [133 S.Ct. 2151].)

*Black* is distinguishable. There, the trial court found that the defendant's prior convictions were " 'numerous or of increasing seriousness.' " (*Black, supra*, 41 Cal.4th at p. 818 & fn. 7; see *id*. at p. 816, fn. 6.) That finding, along with another reached by the jury, satisfied *Cunningham*. (*Black*, at pp. 816-818; accord, *People v. Towne* (2008) 44 Cal.4th 63, 76.) Here, the probation report listed several aggravating factors stemming from defendant's criminal history.[31]

---

[31] The probation report noted that defendant's previous adult convictions and sustained juvenile delinquency petitions were numerous and of increasing seriousness (Cal. Rules of Court, former rule 421(b)(2)), that defendant had served

*(footnote continued on next page)*

The court considered the report but did not expressly find any of those factors true. Additionally, in ruling on the motion to modify the death judgment, it found that the prosecution had proved defendant's prior convictions for armed robbery and felon in possession of a firearm. Again, however, the court did not find an aggravating circumstance based on these prior convictions. (Cf. *Black, supra*, 41 Cal.4th at p. 818 [*three* prior convictions are numerous, citing *People v. Searle* (1989) 213 Cal.App.3d 1091, 1098].)

The only aggravating circumstance found by the trial court to make defendant eligible for the upper term was that Jennifer Parish was particularly vulnerable. The jury did not find this fact nor did defendant admit it. Accordingly, the court's choice of the upper term was improper. (*People v. Myles* (2012) 53 Cal.4th 1181, 1221; *People v. French* (2008) 43 Cal.4th 36, 52 (*French*); *People v. Sandoval* (2007) 41 Cal.4th 825, 837-838 (*Sandoval*).)

Relying on *Sandoval*, the People argue that the failure to afford defendant a jury trial on the aggravating circumstance was harmless beyond a reasonable doubt. They urge us to determine " 'whether, if the question of the existence of an aggravating circumstance or circumstances had been submitted to the jury, the

_____

*(footnote continued from previous page)*

three prior prison terms (Cal. Rules of Court, former rule 421(b)(3)), was on parole when he committed the crimes (Cal. Rules of Court, former rule 421(b)(4)), and demonstrated unsatisfactory performance on probation and parole (Cal. Rules of Court, former rule 421(b)(5)). The probation report listed the following criminal history: In 1987 a juvenile adjudication for misdemeanor carrying a concealed firearm; in 1988 two juvenile adjudications for misdemeanor assault; in 1989 a felony conviction for robbery; and in 1993 and 1994 two felony convictions for felon in possession of a firearm.

jury's verdict would have authorized the upper term sentence.' " (Quoting *Sandoval*, *supra*, 41 Cal.4th at p. 838.)

In *Sandoval*, we held that imposition of the upper term in violation of *Cunningham* can be harmless if the reviewing court concludes, beyond a reasonable doubt, that the jury "would have found true at least a single aggravating circumstance had it been submitted to the jury." (*Sandoval*, *supra*, 41 Cal.4th at p. 839.) We cautioned that this prejudice analysis can be problematic. The reviewing court cannot assume that the record reflects all of the evidence that would have been presented to the jury, or that the defendant had the same incentive and opportunity at a sentencing hearing to contest the aggravating circumstance. (*Id*. at pp. 839-840.) We also observed that "to the extent a potential aggravating circumstance at issue in a particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*Id*. at p. 840.) We continued: "Many of the aggravating circumstances described in the rules require an imprecise quantitative or comparative evaluation of the facts," and cited the victim's particular vulnerability as an example. (*Ibid*.)

Indeed, in *Sandoval*, we considered and rejected the People's contention that the jury's failure to find an aggravating circumstance based on the victim's particular vulnerability was harmless beyond a reasonable doubt. (*Sandoval, supra*, 41 Cal.4th at pp. 840-841.) Noting that the evidence was contested, we concluded: "The record . . . does not reflect such a clear-cut instance of victim vulnerability that we confidently can conclude the jury would have made the same findings, as might be the case if, for example, the victims had been elderly, very young, or disabled, or otherwise obviously and indisputably vulnerable." (*Id*. at p. 842.)

71

We reach a similar conclusion here regarding Jennifer Parish's vulnerability. (See *DeHoyos, supra,* 57 Cal.4th at p. 153 [reviewing aggravating circumstances stated by the court]; *French, supra*, 43 Cal.4th at pp. 43, 54 [same]; *Sandoval, supra,* 41 Cal.4th at pp. 840-843 [same].) Evidence on that point was conflicting. On the one hand, Jennifer was unarmed and taken by surprise by two men, who robbed her at gunpoint while her fiancé lay bleeding at her feet from a fatal gunshot wound to the head. On the other hand, she was a trained law enforcement officer, and the robbery occurred in a lit business establishment in the presence of two others. Jennifer was ultimately uninjured by either defendant. In no way do we minimize Jennifer's victimization. But on this record we cannot conclude with confidence how the jury would have resolved this question had it been presented to them. (Cf. *Neder v. United States* (1999) 527 U.S. 1, 19 [finding instructional error harmless when defendant "did not, and apparently could not, bring forth facts contesting the omitted element".) Accordingly, failure to submit this aggravating circumstance to the jury was not harmless beyond a reasonable doubt.

Ordinarily, when a sentence is reversed for prejudicial *Cunningham* error, the case is remanded for the court to reconsider the entire sentence. (*Sandoval, supra*, 41 Cal.4th at pp. 843-845; *People v. Lincoln* (2007) 157 Cal.App.4th 196, 204 & fn. 3; *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1258-1259.) Such proceedings are "to be conducted in a manner consistent with the amendments to the DSL adopted by the Legislature." (*Sandoval*, at p. 846.) Under the revised sentencing guidelines, no presumptive midterm applies. The court has discretion to impose any of the three terms, provided it states its reasons for its decision, and both parties have the opportunity for argument. (*Id.* at pp. 846-847, 855; §§ 1170, subd. (b), 1170.1, subd. (d).)

Here, however, a remand for resentencing on counts 2 through 11 would have little practical significance given our affirmance of the special circumstances and death sentence.  (See *People v. Cleveland* (2004) 32 Cal.4th 704, 770 (conc. opn. of Chin, J.).)  Transport of a capital prisoner is an expensive and cumbersome undertaking.  It is unclear whether the People wish to relitigate the determinate term or if defendant has additional arguments to present.

Accordingly, in this limited circumstance, we find it appropriate to modify the judgment to reduce defendant's sentence for robbery (count 2) to the low term of two years, and his sentence on the corresponding former section 12022.5 enhancement to the low term of 3 years, for a total determinate term of 5 years on count 2, thereby reducing defendant's aggregate sentence from 34 years four months to 24 years four months.  This modification of the judgment remedies the *Cunningham* error and gives defendant the best possible outcome.  (Cf. *People v. Lyons* (1958) 50 Cal.2d 245, 275-276, overruled on another ground in *Green, supra,* 27 Cal.3d at pp. 32-34.)

We order the modification conditionally, however, recognizing that the People in their briefing also requested a sentencing remand.  (See *People v. Edwards* (1985) 39 Cal.3d 107, 118.)  Given our affirmance of the special circumstances and judgment of death, the People may choose to forgo the time and expense involved in resentencing a capital prisoner.  Because we do not know which option the People would exercise, we adopt a disposition that preserves both.  (*Id*. at p. 118; see *post*, Disposition, p. 76.)

## 2. Alleged discretionary error in imposing consecutive sentences

Defendant claims error because the court gave no reasons for imposing consecutive sentences. He failed to object on this ground below, forfeiting the claim.[32]

*Scott, supra,* 9 Cal.4th 331, explained, "complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*Id.* at p. 356.) "[C]laims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" are subject to forfeiture, including "cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or to give a sufficient number of valid reasons." (*Id.* at p. 353.) We recently affirmed this rule, and do so again. (*People v. McCullough* (2013) 56 Cal.4th 589, 594-595, 597.)

Defendant argues that he did not have a meaningful opportunity to object below. He reasons that "*Scott* was premised, in part, on the assumption that the parties would know before the sentencing hearing what sentence is likely to be imposed and the reasons therefore. [Citation.] That is not the case here, as the probation report does not mention consecutive or concurrent sentencing." He quotes the observation in *Scott* that a meaningful opportunity to object "can occur only if, during the course of the sentencing hearing itself and before objections are

---

**32** Defendant also contends that the trial court erred by (1) relying on victim vulnerability that was not supported by the record and (2) relying on a single aggravating circumstance to impose the upper term on count 2 and its enhancement. These claims are moot in light of our conditional modification of the sentence on count 2 and its enhancement.

made, the parties are clearly apprised of the sentence the court intends to impose and the reasons that support any discretionary choices." (*Scott, supra*, 9 Cal.4th at p. 356.)

We have since clarified that "[t]he parties are given an adequate opportunity to seek . . . clarifications or changes if, at *any time* during the sentencing hearing, the trial court describes the sentence it intends to impose and the reasons for the sentence, and the court thereafter considers the objections of the parties before the actual sentencing." (*People v. Gonzalez* (2003) 31 Cal.4th 745, 752.) "The court need not expressly describe its proposed sentence as 'tentative' so long as it demonstrates a willingness to consider such objections. . . . [¶] It is only if the trial court fails to give the parties any meaningful opportunity to object that the *Scott* rule becomes inapplicable." (*Ibid*.) "In the rare instance where the actual sentence is unexpected, unusual, or particularly complex, the parties can ask the trial court for a brief continuance to research whether an objection is warranted, or for permission to submit written objections within a specified number of days after the sentencing hearing." (*Id*. at p. 754.)

Here, the court, without the benefit of *Gonzalez*, entertained arguments of counsel and then pronounced sentence. Nonetheless, after doing so, it entertained a prosecution request for clarification about the certification of the record, and allowed defense counsel to enumerate his objections to the probation report. It adjourned after asking counsel if there was anything else to discuss. At no time did defense counsel lodge his objections to the imposition of consecutive sentences, or request a continuance. Accordingly, under the settled precedent in *Scott,* the claim is forfeited on appeal.

## III.  DISPOSITION

The case is remanded to the trial court to allow the People to request resentencing on counts 2 through 11.  (See *Peracchi v. Superior Court* (2003) 30 Cal.4th 1245, 1254-1256.)  If the People do not make such a request within 60 days after the filing of our remittitur in the trial court, that court shall proceed as if the opinion modified the judgment to reflect a sentence of two years on count 2, and a consecutive sentence of three years on the attendant enhancement, thereby reducing defendant's aggregate determinate sentence to 24 years four months.  (See *People v. Edwards, supra*, 39 Cal.3d at p. 118.)  The court shall then prepare an amended abstract of judgment reflecting those modifications, and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects the judgment is affirmed.


**CORRIGAN, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**PERREN, J.  \***

_____

\*    Associate Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Boyce

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S092240
**Date Filed:** July 24, 2014

_____

**Court:** Superior
**County:** Orange
**Judge:** Frank F. Fasel

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Douglas Ward, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens, Christine Levingston Bergman and Theodore M. Cropley, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Douglas Ward
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607
(510) 267-3300

Theodore M. Cropley
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2247